830 So.2d 792 (2002)
Alex PAGAN, Appellant,
v.
STATE of Florida, Appellee.
No. SC94365.
Supreme Court of Florida.
April 4, 2002.
Rehearing Denied November 7, 2002.
*798 Richard L. Rosenbaum, Fort Lauderdale, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Scott A. Browne, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
We have on appeal two judgments for first-degree murder[1] and two sentences of death imposed on Alex Pagan. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm both the convictions and sentences.

FACTUAL AND PROCEDURAL BACKGROUND
On March 25, 1993, Alex Pagan (Pagan) and Willie Graham (Graham), also known as Shaikwam, were indicted on two charges of premeditated murder with a firearm committed against six-year-old Michael Lynn and his father, Freddy Jones, as well as the attempted murder of Michael's mother, Latasha Jones (Latasha), and his eighteen-month-old brother, Lafayette Jones. Pagan and Graham were also *799 charged with armed robbery and armed burglary for breaking into the Joneses' home and taking their Cherokee jeep.
During the early morning hours of Tuesday, February 23, 1993, two men entered the master bedroom of the Joneses' home by crashing through the sliding glass doors. At the time, Latasha, Freddy and the couple's toddler were in bed together. No lights were on in the house except a light Latasha regularly left on above the kitchen stove. The two perpetrators were wearing ski masks.
Testimony established that the two men, one hyper and the other calm, demanded money from the couple. One of the intruders indicated he was aware there was $12,000 or $13,000 in the house. He said he wanted that money and had messed up the first time. After Freddy Jones denied having any money, the hyper one began looking through the house for money. In the process, he found Michael, the couple's six-year-old son, in another room. He returned to the couple's bedroom with Michael in tow. He threw Michael on the bed and ordered Latasha to show him where the money was located.
The hyper one grabbed Latasha by her arm with what felt like a gloved hand, placed a gun against her head, and walked her through the house in search of money. After finding no money, Latasha was returned to the bedroom and hit with the gun, causing her nose to bleed. The hyper one looked into the closet for the money, but was ordered by the quiet one to immediately close the door when a light came on inside. He feared they would see his face. Latasha testified the calm one's mask was partially off, and she could see that he was "very bright skinned, looked like he was white." This one called the hyper one a name that sounded like Zack or Sack.[2]
One of the gunmen asked for keys to the jeep. The calm one then told the other one to get rope. Latasha saw the calm one tie up Freddy while the hyper one went into the garage and started up the couple's jeep. Latasha was also tied up and was looking in her husband's direction when she saw the calm one shoot him. She turned her head away and heard the calm one tell Michael, "Shorty, if you live through this, don't grow up to be like me." She heard more shots. After she was shot, Latasha pretended she was dead. More shots were fired and her baby began screaming. She believes she heard seven or eight shots and testified that the hyper one was standing in the doorway when the quiet one shot her husband.
Once the perpetrators left the house in the jeep, Latasha kicked herself free of the ropes and called out to her husband and Michael. After receiving no response, she grabbed her baby and fled into the street screaming for help. A neighborhood paramedic came to her aid. Police later discovered that Michael Lynn had been shot four times, three times in the head and once in the buttocks.
Latasha also testified her house was burglarized January 23, 1993, and that approximately $26,000 worth of clothes, jewelry, and cash was taken. She identified a picture of her wearing jewelry, including an anchor with a crucifix, and also identified pictures of a Honda ring and a Cadillac ring. She was able to identify the Cadillac ring, a chain with a large anchor, and a man's bracelet as her husband's. Some of these items were recovered from Pagan's residence on February 27, 1993, the day of his arrest. Other items of jewelry were taken by Graham to two pawn shops in the area.
*800 Antonio Quezada and Keith Jackson, both friends of the defendants, testified they spent some time with both Pagan and Graham after the January burglary and saw both of them wearing the same jewelry that was identified by Latasha as stolen from her home. Quezada testified that Pagan told him the next time they would do it right.[3] On the night of the murders, Quezada drove Pagan and Graham to the Jones home. Quezada indicated he dropped Pagan and Graham off around the corner from the Joneses. En route Pagan said they would kill everybody, and Graham seemed to agree. Quezada also said Pagan and Graham had gloves, but he did not see either guns or ski masks.
Quezada further testified that he went home after dropping off Pagan and Graham, and he did not expect to see them again that night. However, later the same night he responded to a knock on the door-it was Pagan.[4] Pagan came into the apartment and told Quezada that he had killed everyone, including the children. Pagan asked Quezada to take Graham to the bus station. In response to Quezada's inquiry of how they had gotten to his house, Pagan said they had stolen the victim's car, left it at a supermarket, and offered someone gas money in exchange for a ride to Quezada's apartment.
Quezada agreed to take Graham to the bus station. Graham appeared upset and indicated he was mad because they "didn't get anything." Prior to going to the bus station, the three (Quezada, Pagan, and Graham) drove to South Beach and other parts of Miami for one and one-half to two hours. During this ride, the home invasion and murders were discussed, including the disposition of the gun that was used. When initially questioned by the police, Quezada maintained he was with Pagan all night on the night of the murders. He later said this alibi was a lie.
Keith Jackson also testified that Pagan admitted he committed the home invasion murders. He also explained that the Jones home was targeted for a burglary because the occupant was a big drug dealer and they could get some money from the house. Although Jackson said he was not really interested in burglarizing the house, he participated in several conversations with Pagan and Graham about a possible burglary. Jackson said that on January 23 he received a call from Pagan and Graham saying they had "hit" the house. When they came to Jackson's house, they had a lot of gold jewelry, including a chain with Latasha's name on it. At trial, Jackson identified some of the jewelry he had previously seen. Pagan and Graham took him to see the house they had burglarized and indicated they were going to go back because they had not gotten all of the money that was supposed to be in the house.
Jackson testified that on the day after the murders he tried to get in touch with Graham but was unsuccessful. He got in touch with Pagan, and Pagan and Quezada came to Jackson's house. During a conversation in the bedroom between Jackson and Pagan, Pagan admitted to shooting everybody in the house. Additionally, Pagan told him they had dismantled the gun[5] *801 and scattered it over Miami. Jackson told Pagan that two witnesses were not dead, the baby and the female. On another occasion, Jackson said Pagan told him he shot the people because a light came on in the house and he thought they may have seen his face.
The trial began on November 4, 1996, and a verdict of guilty on all counts was rendered on December 20, 1996. Pagan then filed a motion for new trial on December 31, 1996, asserting sixteen grounds for relief. The motion was denied, and penalty phase proceedings were conducted on March 3, 1997.
After the State presented evidence concerning Pagan's prior criminal record, a sexual battery and two aggravated batteries, the defense put on its case for mitigation. The witnesses included family, neighborhood friends, an attorney, and a records supervisor with the Broward Sheriff's Office. The first witness called was Pagan's uncle, Carmello Miranda. Mr. Miranda testified that Pagan's parents separated when he was approximately two years old. Mr. Miranda babysat and spent a lot of time with Pagan. He indicated Pagan was a good boy, who was always helpful around the house and in the neighborhood. Pagan told his children to stay in school and do their best.
Video depositions of Yolanda Esbro and Anthony Penia were played for the jury. Ms. Esbro knew Pagan from the neighborhood he grew up in; her son was a close friend of Pagan's when they were in the third grade and the two remained close thereafter. She opined that Pagan and his sister got along well. Anthony Penia was Pagan's best friend growing up. He said Pagan was a funny, nice, and good person.
Maria Rivera, Pagan's mother, testified concerning his childhood and relationship with his father, Michael Pagan. She indicated that Michael was married when she first met him. When Pagan was seven months old, she had an altercation with Michael, and Michael physically abused her. After her daughter Yvette was born, she tried to make up with Michael, but he said he did not love her and had someone else. Maria was able to take care of the children with the help of her grandmother. During this time, the father did not visit. When Pagan was eighteen years old, he was charged with an offense against a girl. He spent four or five years in prison. After his release, he started drinking and his personality changed.
Pagan's great-grandmother, Provilencia Alasaya, testified that she raised him in New York. His sister, Yvette Pagan, testified he was a good brother to her and treated her with respect.
Sharon Livingston, a classification records supervisor with the Broward Sheriff's Office, testified she reviewed his file and noted he had been incarcerated since his arrest in 1993. During that time he had not accumulated any disciplinary reports; he had an exemplary prison record. Michael Rocque, a lawyer and law professor at Nova Law School, testified he represented Pagan for a year but had to withdraw from the case because of personal problems. Rocque indicated Pagan helped him by giving him positive advice concerning his personal life.
The penalty jury recommended the Pagan be sentenced to death by a vote of seven to five.
Dr. Martha Jacobson, a licensed psychologist and an expert in the field of forensic psychology, testified on Pagan's behalf at the Spencer[6] hearing. She indicated Pagan has a borderline personality *802 disorder and suffered from attention deficit disorder as a child. In response to Dr. Jacobson's testimony, the State presented Dr. Harley Stock, a forensic psychologist, who disputed Jacobson's finding of borderline personality disorder, concluding instead that Pagan suffered from antisocial personality disorder. Dr. Stock also took issue with Dr. Jacobson's conclusion that Pagan suffered from attention deficit disorder, finding instead that Pagan scored high on tests requiring attention to detail and environment. Moreover, the doctor indicated Pagan had no problem paying attention during his lengthy jail interview.
Other defense evidence was presented at the Spencer hearing, including a videotaped deposition of Michael Pagan, the defendant's father. The testimony of Pagan's aunt, Doris Bardandaes, concerning Pagan's relationship with his family during the course of his life was also received by the trial judge. A former roommate, Cynthia Valera, presented evidence concerning Pagan's relationship with her two small children and Pagan's actions and attitudes when he had been drinking.
The trial court entered its sentencing order on October 15, 1998, imposing a sentence of death for each of the murders. In support of the sentences, the trial court found three aggravating circumstances: that Pagan had been convicted of a prior violent felony; that the murder was committed during the course of a felony; and that the murder was cold, calculated, and premeditated.[7] The trial court also found as a statutory mitigating circumstance, under the catch-all of any other factor, that Pagan had a deprived childhood. Several nonstatutory mitigators were found, including that Pagan suffered from attention deficit disorder; had a borderline personality disorder; was a loving brother; was a loving grandson and great grandson; was a loving friend; and displayed good conduct while in custody.
Pagan raises seventeen claims in this appeal: (1) there was insufficient evidence presented at trial to sustain his conviction and to support the trial court's denial of his motion for judgment of acquittal; (2) the trial court improperly admitted Williams[8] rule evidence; (3) the trial court erred in denying Pagan's motion to suppress physical evidence; (4) the trial court erred in refusing to grant a new trial or to declare a mistrial when the prosecutor improperly bolstered the credibility of a state witness; (5) the trial court erred in admitting recorded hearsay; (6) the trial court erred in denying Pagan's motion for new trial and upholding the State's Batson[9] challenge to a juror; (7) the trial court abused its discretion in reviewing Pagan's motion for mistrial and, therefore, erred in refusing to order a new trial; (8) the trial court erred in refusing to grant one or more of Pagan's motions for mistrial; (9) the trial court erred in permitting the showing of photographs of the deceased; (10) the trial court erred in denying Pagan's motion for a new trial based on a Richardson[10] violation when testimony concerning a voice lineup was permitted; (11) the trial court erred in denying Pagan's motion for mistrial when the prosecutor in closing argument made an improper golden rule argument; (12) the trial court erred in denying Pagan's motion *803 for mistrial when the prosecutor in closing argument referred to a camouflage jacket from the Desert Storm military campaign which was not in evidence and which was highly prejudicial; (13) the trial court erred in permitting over defense objection the testimony of Keith Jackson concerning the death of a six-year-old child; (14) the trial court erred in overruling objections and permitting the medical examiner to express expert opinions on glass; (15) the trial court erred in granting the State's motion for a voice lineup and in allowing testimony relating to the voice lineup; (16) these cumulative errors require reversal and remand; and (17) Pagan's death sentence is not proportionate. No issue has been raised concerning the evidentiary basis for the aggravating or mitigating circumstances.

DISCUSSION

Sufficiency of Evidence
Pagan first argues the evidence presented at trial was wholly circumstantial and insufficient to support the trial court's denial of his motion for judgment of acquittal. After the prosecution finished presenting its case, defense counsel asserted the State had not presented evidence sufficient to implicate Pagan in this crime and again asked that the evidence seized from his apartment be suppressed. Defense counsel contended that without this evidence, Pagan could not be linked to the crime. He also argued that premeditation was not established. The trial court denied both the motion for judgment of acquittal and the motion to suppress.
In reviewing a motion for judgment of acquittal, a de novo standard of review applies. See Tibbs v. State, 397 So.2d 1120 (Fla.1981). Generally, an appellate court will not reverse a conviction which is supported by competent, substantial evidence. See Donaldson v. State, 722 So.2d 177 (Fla.1998); Terry v. State, 668 So.2d 954, 964 (Fla.1996). If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction. See Banks v. State, 732 So.2d 1065 (Fla.1999). However, if the State's evidence is wholly circumstantial, not only must there be sufficient evidence establishing each element of the offense, but the evidence must also exclude the defendant's reasonable hypothesis of innocence. See Orme v. State, 677 So.2d 258 (Fla.1996). Because the evidence in this case was both direct and circumstantial, it is unnecessary to apply the special standard of review applicable to circumstantial evidence cases. See Wilson v. State, 493 So.2d 1019, 1022 (Fla.1986).
Pagan was convicted of two counts of first-degree murder and two counts of attempted first-degree murder, all of which require a showing of premeditation. See Green v. State, 715 So.2d 940, 943 (Fla.1998) (premeditation distinguishes first-degree murder from second-degree murder). As we stated in Wilson:
Premeditation is more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose to kill may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act.
493 So.2d at 1021. There is direct evidence of Pagan's confessions[11] and statements made to Antonio Quezada and Keith *804 Jackson explaining his intent and motive for the crimes.
In addition, the evidence that jewelry from the January robbery was found in Pagan's residence, both Quezada and Jackson testified that Graham and Pagan admitted burglarizing the Joneses' house in January. After the first burglary, they were dissatisfied with the cash, jewelry, and clothing they had taken and wanted to get the large sum of money they believed was on the premises. After the January crime, Quezada drove Graham, Pagan, Jackson and another friend, Alfie Santiago, by the Joneses' home so that Graham and Pagan could point out the house they had burglarized. Graham and Pagan stated they were going to burglarize that house again. Latasha Jones also testified one of the gunman said he had "messed up the first time." Moreover, Quezada testified that on the night of the crimes, Graham and Pagan asked him to give them a ride to the street where the Joneses' home was located. During the trip there, Pagan stated he and Graham were going to break into the house and kill everyone inside.
In addition to Quezada's testimony that Pagan stated he and Graham were going to burglarize the Joneses' residence on the night in question, Keith Jackson also testified that the day after the murder Pagan told him he tied up the adult male and one of the kids, shot everyone, and stole the couple's jeep. Pagan indicated he dropped the jeep off near a supermarket, then hitched a ride to Quezada's house. Latasha's testimony that her assailants repeatedly demanded money while holding a gun to her head and pointing a gun at her entire family indicates that the perpetrators did in fact enter her home without permission, threaten her with a firearm, and steal her jeep. Latasha's testimony that the "bright-skinned" one, who was also the calm and quiet one, reached into her husband's pants, took out his car keys and ordered the "hyper" one to start the car is further evidence of robbery and burglary.
This Court has previously found that statements of intent made prior to the crime are sufficient to establish premeditation. See Asay v. State, 769 So.2d 974 (Fla.2000) (statements made close to the time of the crime demonstrated defendant's motive for committing the homicide); Almeida v. State, 748 So.2d 922 (Fla.1999) (statements about the wound that a certain type of bullet would leave were evidence of premeditation); Jennings v. State, 718 So.2d 144 (Fla.1998) (defendant's statements that if he ever needed money he would just rob some place and kill the witnesses were evidence of premeditation). The evidence of these statements of intent clearly established the connection between Pagan and Graham and the previous burglary of the Joneses' home and established the motive for the later burglary and robbery, the premeditation for the murders, and the identity of the perpetrators of these crimes, Pagan and Graham.
The jewelry and clothing seized at Pagan's residence which belonged to the Joneses, combined with his confessions to Quezada and Jackson, establish beyond a reasonable doubt that Pagan was one of the perpetrators of these crimes. The defense argument in the motion for judgment of acquittal that the identity of Pagan as one of the perpetrators was not sufficiently established is without merit. The trial court did not err in denying Pagan's motion for judgment of acquittal.

Williams Rule Evidence
Pagan next argues the trial court erred in admitting evidence of other crimes that was dissimilar, factually and temporally. The admissibility of Williams rule evidence was raised and argued before trial. *805 The trial court denied the motion and told defense counsel that he should object when the prosecutor sought to introduce the evidence at trial. This argument was again raised in a subsequent motion for new trial and denied.
Generally, evidence of other crimes or acts may be admitted if relevant to prove a material fact in issue. See Bryan v. State, 533 So.2d 744, 746 (Fla. 1988). Section 90.404(2)(a), Florida Statutes (1995), provides:
Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.
However, relevancy is not the only test for the admission of such evidence. Relevance must be weighed against the prejudice it would cause. Section 90.403, Florida Statutes (1995), states in pertinent part: "Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence."
Another consideration in determining the relevance of evidence of other crimes or wrongs is whether or not the proffered act or crime is inextricably tied to or inseparable from the charged crime. See Hunter v. State, 660 So.2d 244 (Fla. 1995); State v. Cohens, 701 So.2d 362 (Fla. 2d DCA 1997). Many times acts closely tied to the charged crime help establish the entire context out of which a criminal act arose. See Remeta v. State, 522 So.2d 825 (Fla.1988).
In this case, evidence of the January burglary helped explain the motive for the home invasion in February, during which the murders were committed, and to establish the identity of the perpetrators. Both Quezada and Jackson testified Pagan complained he had not gotten enough out of the first burglary and would return. As the State points out, the January burglary explains why the assailants seemed disinterested in the jewelry in the house and instead demanded cash from Latasha and Freddy Jones.
Pagan's argument that evidence of the January burglary became a feature of the trial is also meritless. While both Jackson and Quezada stated they saw the jewelry and clothing later seized by police in Pagan and Graham's possession following the January burglary, this testimony was a small part of the overall testimony from these witnesses. The focus of these witnesses' testimony was the admissions made to them by the defendants. Moreover, while Latasha was allowed to identify the same evidence as her property, this was not the main focus of her testimony. The bulk of her testimony was devoted to the events which took place during the burglary, robbery and murders in February. Several pieces of the jewelry identified by Quezada, Jackson, and Latasha were found in Pagan's home when he was arrested for these murders on February 27, 1993. Graham was linked by pawn shop receipts to other pieces of the identified property, which was later recovered from the two pawn shops.[12]
Since the testimony was relevant and probative of material facts at issue and *806 was not made a feature of the trial, the trial court did not err in admitting this evidence. See Sexton v. State, 775 So.2d 923 (Fla.2000) (holding evidence that the defendant had fathered two of his daughter's children, was involved in the death of a baby fathered by his son-in-law, and had engaged in a standoff with Ohio police that resulted in him becoming a fugitive was admissible to explain defendant's motive for having his son kill his son-in-law).

Motion to Suppress

Probable Cause and The Affidavit
Pagan argues that his motion to suppress physical evidence obtained in a search of his residence should have been granted because there was no probable cause for the search, the affidavit in support of the search warrant contained false statements, and the police officers exceeded the scope of the warrant.[13] We disagree and affirm the trial court's ruling. As has often been stated, a trial court's ruling on a motion to suppress comes to the appellate court clothed with a presumption of correctness, and the reviewing court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling. See Murray v. State, 692 So.2d 157 (Fla.1997). The reviewing court is bound by the trial court's factual findings if they are supported by competent, substantial evidence. See Butler v. State, 706 So.2d 100 (Fla. 1st DCA 1998). The trial court's determination of the legal issue of probable cause is, however, subject to the de novo standard of review. See Ornelas v. United States, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); Connor v. State, 803 So.2d 598 (Fla.2001).
In determining whether probable cause exists to justify a search, the trial court must make a judgment, based on the totality of the circumstances, as to whether from the information contained in the warrant there is a reasonable probability that contraband will be found at a particular place and time. See Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). As the Court in Gates put it:
The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.
462 U.S. at 238-39, 103 S.Ct. 2317. This determination must be made by examination of the four corners of the affidavit. See Schmitt v. State, 590 So.2d 404 (Fla. 1991); Delacruz v. State, 603 So.2d 707 (Fla. 2d DCA 1992). The affidavit must state that the affiant has personal knowledge of the confidential informant's veracity or the affidavit must contain sufficient independent corroborating evidence. As this Court said in State v. Peterson, 739 So.2d 561 (Fla.1999):
Hearsay information provided by a confidential informant can be sufficient to support a search warrant, see State v. Wolff, 310 So.2d 729, 733 (Fla.1975), provided the affidavit satisfies the Gates *807 test. See State v. Butler, 655 So.2d 1123, 1126-30 (Fla.1995). "Veracity" and "basis of knowledge" are among the factors to be considered in assessing the reliability of an informant's information. See Vasquez v. State, 491 So.2d 297, 299 (Fla. 3d DCA 1986).
739 So.2d at 564.
When properly challenged, the affidavit must also be examined for omissions made with intent to deceive or with reckless disregard of whether such information should have been revealed to the magistrate. See Johnson v. State, 660 So.2d 648 (Fla.1995). The reviewing court must determine whether the omitted facts, if added to the affidavit, would have defeated probable cause and whether the omission resulted from intentional or reckless police conduct that amounts to deception. See State v. Van Pieterson, 550 So.2d 1162 (Fla. 1st DCA 1989). The inclusion of statements by innocent mistake is insufficient to defeat the authenticity of an affidavit. See Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Even where a court finds the police acted deceptively, it must excise the erroneous material and determine whether the remaining allegations in the affidavit support probable cause. If the remaining statements are sufficient to establish probable cause, the false statement will not invalidate the resulting search warrant. See Terry v. State, 668 So.2d 954 (Fla. 1996). If, however, the false statement is necessary to establish probable cause, the search warrant must be voided, and the evidence seized as a result of the search must be excluded. See id. (citing Franks, 438 U.S. at 156, 98 S.Ct. 2674); see also Thorp v. State, 777 So.2d 385 (Fla.2000).
In this case, an evidentiary hearing was held on the defense motion to suppress. Several witnesses testified at the hearing including Tameka Roberts, Anthony Graham's girlfriend.[14] Roberts testified that detectives questioned her about statements allegedly made by her mother, Sharon Foster, and about her knowledge of the homicides. She denied making the statement that according to Anthony Graham, Willie and Alex committed the murders. However, Detectives Manzella and Peluso testified that Anthony told Roberts that Willie and Alex had committed the murders and this information was relayed to Sharon Foster.
Detective Manzella testified that the two confidential sources indicated in the affidavit for the search warrant were Sharon Foster and Wanda Jackson, Keith Jackson's wife. Foster called the police station anonymously on February 23, 1993, and indicated she had information about the homicides. The next day she met with Manzella and gave him information she heard "on the street" and from her daughter concerning Willie and Alex (Willie Graham and Alex Pagan). Foster told Manzella that Eric Miller planned the January and February burglaries of the Jones residence, and said her nephew, Darell Featherstone, received some proceeds from the burglary and a man named Alex was a participant. Manzella admitted that he failed to put Eric Miller's name in the affidavit or to indicate that a source of information was "from the streets" when referring to the information provided by Foster. Basically, the information Foster gave the police was first heard "on the streets," then obtained from her daughter, Tameka Roberts, and while Foster indicated Miller planned the burglaries, she stated he did not commit the murders. The omission of these two minor details from the affidavit does not negate the fact that the information which was contained in the *808 affidavit gave the magistrate a substantial basis for concluding that probable cause existed to search the Pagan's residence. See Illinois v. Gates.
Detective Peluso testified he met with Wanda Jackson in the presence of Detective Manzella and showed her pictures of several individuals. She identified Willie Graham and said her husband told her Graham was involved in the murders. According to Detective Peluso, Wanda Jackson described the perpetrators as a Latin male named Alex who was between twenty-one and twenty-three and wore nice clothes; the other individual was a black male named Willie Graham. She had met both men at a party three weeks before the murders. Detective Peluso believed that Wanda Jackson's information was credible because her husband was a known associate of the defendants. The detectives were told that both Alex and Willie lived in Miramar, and this information was independently verified prior to application for the search warrant. The detectives opined that the information received from the confidential sources as well as the information received from Keith Jackson, a person named in the affidavit, was consistent with the known facts and with information obtained from the surviving adult victim.
Pagan complains the police failed to say in the affidavit that Keith Jackson was both a source of information and a potential suspect and failed to name the two independent sources (Sharon Foster and Wanda Jackson). However, these claims are without merit. Keith Jackson was in fact named in the affidavit, and Detective Peluso admitted that although Keith Jackson was a suspect at the start of the investigation, he was no longer one when he finished giving his statement to the police on the evening of February 26, 1993. The affidavit did include the information that Keith Jackson initially denied any knowledge of the murders, and it included the information that Keith Jackson had been a codefendant with Willie Graham in a prior homicide. The omission of the fact that at one point Jackson was a suspect does not alter the fact that the information contained in the affidavit established probable cause for the search and the arrest. See Power v. State, 605 So.2d 856 (Fla.1992); State v. Schulze, 581 So.2d 610 (Fla. 2d DCA 1991).
Pagan has failed to demonstrate that the trial court's ruling on the motion to suppress was error.

Scope of the Search
Pagan next agues that the gold Honda ring, a gold cross, a black suede jacket, and a gold chain with a crucifix, which were not named in the warrant, were illegally seized and should not have been admitted into evidence. He states the items seized were not immediately identifiable as contraband and thus not subject to seizure under the plain view doctrine. See Jones v. State, 648 So.2d 669 (Fla.1994). We disagree and affirm the trial court's denial of the motion to suppress on this ground.
The plain view doctrine provides that items in plain view may be seized when (1) the seizing officer is in a position where he has a legitimate right to be, (2) the incriminating character of the evidence is immediately apparent, and (3) the seizing officer has a lawful right of access to the object. Horton v. California, 496 U.S. 128, 136, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). In this case, the search warrant provided that evidence relevant to proving a felony might be found at Pagan's residence, and permitted a search for firearms, weapons, drugs, and drug paraphernalia. More specifically, the warrant allowed seizure of a dark-colored trench coat, a wool ski mask brown in *809 color, and gloves, but did not list jewelry. However, the officers who conducted the search knew there had been two burglaries of the Jones residence, knew that jewelry was taken during these burglaries, and knew that both Pagan and Graham were suspects in those burglaries. Moreover, one of the officers made the connection between the Honda ring and the fact that there was a Honda vehicle at the victims' residence. Thus, the incriminating nature of the jewelry was immediately apparent to the officers. We find the trial court properly denied Pagan's motion to suppress physical evidence seized in plain view during the execution of the search warrant since the officers had probable cause to search in the areas where the items were seized, the incriminating nature of the objects was immediately apparent, and the officers had lawful access to the seized items. See id.

Bolstering Witness Credibility
Pagan argues the trial court erred in denying his motion for a mistrial based on the prosecutor's closing argument. He contends the prosecutor improperly bolstered the credibility of Latasha Jones by referring to the terror and horror she experienced and using that fact to excuse her inability to estimate the height of her attackers. We reject Pagan's argument and find that the prosecutor's comments during closing were in direct response to argument made by the defense.
During defense counsel's closing argument an attempt was made to put at issue the descriptions of the murderers made by the surviving victim, Latasha Jones. Counsel was trying to say the descriptions more closely matched other suspects in the case and were in direct contrast to the persons on trial. Latasha Jones testified that she was scared during the time that the burglary, robbery, and murders were being perpetrated. She said she did not get a really good look at her attackers and said she was not good at estimating heights and weights. In response to defense counsel's comments on this testimony, the prosecutor made the comments Pagan claims as error. These statements were, however, a fair statement of the evidence produced during the trial and fair rebuttal of the defense closing argument. See Hamilton v. State, 703 So.2d 1038 (Fla.1997) (finding prosecutorial comment during closing argument fair comment when based on evidence presented at trial).
Pagan has failed to demonstrate that the trial court abused its discretion in failing to grant the motion for mistrial.

Admission of Recorded Hearsay
Pagan also argues the trial court erred in improperly allowing the State to introduce a prior consistent statement in the form of a tape recording of a conversation between Antonio Quezada and Keith Jackson. We deny relief on the claim because the evidence was admissible to rebut the defense claim of recent fabrication.
Generally, prior consistent statements are not admissible to bolster a witness's testimony at trial. See Chandler v. State, 702 So.2d 186 (Fla.1997). In order to be admissible, prior consistent statements, like other hearsay statements, must qualify under a hearsay exception. "However, prior consistent statements are considered non-hearsay if the following conditions are met: the person who made the prior consistent statement testifies at trial and is subject to cross-examination concerning that statement; and the statement is offered to `rebut an express or implied charge ... of improper influence, motive, or recent fabrication.'" Id. at 197-98 (quoting Rodriguez v. State, 609 *810 So.2d 493, 499 (Fla.1992)) (quoting section 90.801(2)(b), Florida Statutes (1989)).
The trial court permitted certain portions of a recorded conversation between Keith Jackson and Antonio Quezada to be played in court following direct examination of Quezada. The police-orchestrated recording was made on March 5, 1993, in Keith Jackson's girlfriend's car and with his cooperation. The portions played at trial reflect Quezada agreeing he dropped Graham and Pagan off near the Jones residence, that they did not get anything from the home invasion, that Graham had on a pair of latex gloves while Alex wore regular gloves, and that Graham wore an army jacket.
The prosecutor offered this statement to show that Quezada's trial testimony was not influenced by a subsequent plea agreement[15] he entered into with the State on November 17, 1993, or by the media. This was done to rebut the defense attorney's attempts to show that Quezada was influenced by these events. For instance, Pagan's attorney questioned Quezada about his motivation in testifying and his belief that sometimes lying is alright to save one's life. This questioning followed earlier admissions by Quezada that he had lied to the police for months after the incident in an attempt to maintain his loyalty to his close friend Pagan. He also admitted to lying under oath in a proceeding in which he tried to obtain a protective order against police who had allegedly assaulted him. The trial court did not err in admitting the recorded statement.

Batson Challenge to Juror Laster
As his next claim, Pagan argues the trial court erred in failing to strike juror Laster because he was a conservative juror with conservative ideas. This issue has not been preserved for review since the record reveals there was no challenge by the defense to Laster serving on the jury.[16]

Failure to Grant a New Trial
Pagan claims the trial court reversibly erred in refusing to grant his motion for a new trial based on each of the grounds raised in his motion filed on December 31, 1996. He also argues that the trial court erred in failing to grant one or more of his motions for mistrial made during the course of the trial. The record reflects that the motion for new trial contained sixteen claims.[17] The claim as *811 raised here has not been argued with specificity. As we indicated in Duest v. Dugger, 555 So.2d 849, 852 (Fla.1990), "Merely making reference to arguments below without further elucidation does not suffice to preserve issues, and these claims are deemed to have been waived."
As a part of his claim that the trial court should have granted his motion for mistrial, Pagan reargues the admissibility of the Williams rule evidence and the recorded conversation between Quezada and Jackson. As we indicated above, the trial court did not abuse its discretion in admitting this testimony. The rest of the argument is devoted to a simple recitation of instances where a motion for mistrial was made; no substantive argument accompanies these recitations. Therefore, as with Pagan's argument concerning the motion for a new trial, the lack of specificity precludes effective appellate review. Pagan is not entitled to relief based on this nonspecific claim. See Freeman v. State, 761 So.2d 1055 (Fla.2000); Valle v. State, 705 So.2d 1331 (Fla.1997).

Inflammatory Photographs
Pagan, in another nonspecific argument, contends the trial court erred in admitting inflammatory photographs of the deceased child victim. We deny relief based on the admission of photographs because Pagan has not demonstrated that the trial court abused its discretion in allowing the photographs into evidence; indeed, the defense has failed to demonstrate that any objection was made to these photographs. Thus, the issue has not been preserved for review.[18]

Richardson Violation
Pagan claims he was not informed that Deputy McPhaul, a lineup deputy for the Broward Sheriff's Office who conducted the voice lineup,[19] would be *812 called as a witness, and therefore his motion for mistrial should have been granted. This claim is refuted by the record. During a Richardson hearing held on December 3, 1996, the prosecutor indicated he wished to call McPhaul to supplement testimony given earlier by Latasha Jones about the voice lineup. He stated that he had not planned on calling this witness; therefore, he had not provided her name in his witness list. However, when the defense counsel opened the door to testimony about the voice lineup, the prosecutor decided McPhaul's testimony would be important. During the hearing, the prosecutor stated that McPhaul's name was included in a two-page Broward County Sheriff's report regarding the voice lineup conducted in October 1993. Defense counsel admitted he received a report from Detective Manzella that "supposedly lists the name [sic] of the people who were in the room at the time." Additionally, defense counsel did not dispute the prosecutor's assertion that Pagan's counsel was present during the voice lineup. Judge Lebow, although ruling that no Richardson violation had occurred, required the prosecutor to allow the defense to depose McPhaul prior to putting her on the stand.
When the trial court is given notice of an alleged failure to disclose witnesses, it has a duty to conduct a Richardson inquiry as to the nature of the violation to determine whether the violation was willful or inadvertent and whether there was undue prejudice to the accused. See Richardson v. State, 246 So.2d 771, 775 (Fla.1971); Webber v. State, 510 So.2d 1210, 1211 (Fla. 2d DCA 1987). Such an inquiry took place in this case, and the trial court determined there was no Richardson violation. In an abundance of caution, the trial court also allowed the defense to depose the witness.[20] No relief is warranted on this claim.

Claim of Improper Golden Rule Argument
Pagan claims that the following comments by the prosecutor during closing argument were error and the trial court should have granted his motion for a mistrial:
They wore the gloves, they destroyed the guns, they wore the masks, they ditched the car, they designed and tailored their actions to get away with these horrible brutal murders, senseless murders, murder that appears to be committed with as much feeling as stepping on a roach and they designed those crimes so that he can get away with them. He wanted to get away with it. Now he wants to get away with them now. You are the only force on earth that can prevent that from happening.
Specifically, Pagan claims that the prosecutor made an improper golden rule argument in making these comments and in asserting that the defendant would kill again. The trial court properly denied Pagan's motion for mistrial because the comment is neither an improper golden rule argument nor an assertion that Pagan will kill again.
"In general, a `golden rule' argument encompasses requests that the jurors place themselves in the victim's position, that they imagine the victim's pain and terror, or that they imagine that their relative was the victim." Williams v. State, 689 So.2d 393, 399 (Fla. 3d DCA 1997); see also Davis v. State, 604 So.2d 794, 797 (Fla. *813 1992); Bertolotti v. State, 476 So.2d 130, 133 (Fla.1985). The argument Pagan complains of in no way violates the prohibition against such arguments. The prosecutor did not ask the jury to place themselves in the victim's position, to imagine the victim's pain and terror, or to imagine that their relative was the victim.
Moreover, the prosecutor did not argue, as Pagan contends, that Pagan would go out and commit other crimes if the jury did not convict him. Thus, the trial court did not abuse its discretion in refusing to grant a mistrial. See Cole v. State, 701 So.2d 845 (Fla.1997) (ruling on a motion for mistrial is within the sound discretion of the trial court).

Improper References to Camouflage Jacket
Pagan argues the trial court abused its discretion in failing to grant a mistrial based on improper prosecutorial comments during closing argument. Specifically, Pagan argues that reference by the prosecutor to a "Desert Storm" camouflage jacket was in error because that jacket was not in evidence. The comments read as follows:
Prosecutor: We've heard that Mr. Pagan
 had on a black coat and Graham
 had on a camouflaged
 army jacket and back
 around 1992 they were talking
 about Desert Storm and
 camouflage, desert camouflage
 is different than
Defense Counsel: Objection, your Honor.
Court: Sustained.
Prosecutor: You can just take into account
 your own common sense.
 Camouflage has many different
 colors in it.
Defense Counsel: Objection, side bar.
Court: Come to the side.
Defense Counsel: I'm going to object as to the
 improper bolstering of the
 credibility of this witness by
 evidence that has not been
 given in this case. The
 State's continued trying to
 described [sic] the jacket
 that Willie Graham was
 wearing that night knowing
 there was no evidence given
 is the gross attempt to bolster
 the credibility of that
 witness.
Court: Objection's sustained. There's
 no evidence of anything, different
 kind of camouflage or
 anything else. It's not a
 reasonable inference from
 the evidence that has been
 presented, so the objection
 is sustained.
Defense counsel: I think the colors of camouflage,
 I mean, by definition
 is a reasonable inference
 that camouflage is different
 colors.
As the State points out, there was reference to a camouflage jacket in testimony introduced during trial. Thus, reference to a camouflage jacket during closing argument was not in error.
The prosecutor's reference to "Desert Storm," however, was error because this was not a fact introduced at trial, nor a fact that could be reasonably inferred from the evidence presented at trial. However, any error in prosecutorial comments is harmless if there is no reasonable probability that those comments affected the verdict. See Hitchcock v. State, 755 So.2d 638, 643 (Fla.2000); King v. State, 623 So.2d 486, 488 (Fla.1993). After a review of this record, there is no reasonable probability that the prosecutor's single reference to "Desert Storm" affected the verdict in this case. Thus, any error in referencing "Desert Storm" was harmless and the trial court did not abuse its discretion in refusing to grant a mistrial based on the prosecutor's comment. See Cole, 701 So.2d at 853.

Keith Jackson's Testimony Regarding Six Year Old Victim
Pagan argues that the trial court reversibly erred in failing to grant a mistrial *814 when Keith Jackson testified that he was motivated to cooperate with the police because a six-year-old child was murdered. When the prosecutor asked Jackson a question concerning his reaction and thoughts on the death of the child, defense counsel objected. The trial court sustained the objection, and defense counsel moved for a mistrial. A mistrial was denied. Pagan has not demonstrated that the trial court's ruling on the motion was error.
A motion for a mistrial should only be granted when an error is so prejudicial as to vitiate the entire trial. See Snipes v. State, 733 So.2d 1000 (Fla.1999); Buenoano v. State, 527 So.2d 194 (Fla. 1988). "It has been long established and continuously adhered to that the power to declare a mistrial and discharge the jury should be exercised with great care and caution and should be done only in cases of absolute necessity." Thomas v. State, 748 So.2d 970, 980 (Fla.1999). In this case, there was no necessity for a mistrial. The witness had been examined and cross-examined concerning his varying statements and his motivation for testifying and cooperating with the police. The fact of the matter is that one of the murder victims was a six-year-old child. Such a fact may be relevant to a witness's motivations. It was an issue for the jury to decide.

Unqualified Expert Testimony
Pagan alleges it was error to allow the medical examiner to render an expert opinion about whether breaking through tempered glass would cause injuries without evidence of his expertise in this field. The record reflects that the medical examiner's education, background in glass, and years of experience in medicine were explored and presented to the jury prior to his rendering an opinion. Dr. Ronald Wright was the Broward County district medical examiner at the time of this murder and a certified anatomic chemical forensic pathologist. He testified that during his twenty-four-year career he had extensive experience in the types of injuries caused by glass. Once his general experience was established, the prosecutor asked Dr. Wright if he was familiar with types of glass used in sliding doors in South Florida. He responded affirmatively and proceeded to discuss the construction of glass doors. He explained that the glass in the sliding doors at the Jones residence was made of glass that had been sintered, heated, then rapidly cooled, causing internal fracture lines so that if broken it would shatter into small squares. When the prosecutor asked Dr. Wright his opinion of whether a person who came into contact with that type of glass would be injured, defense counsel objected, contending the inquiry called for speculation. The court permitted the question. Dr. Wright opined it would be highly unlikely that a person who kicked in or crashed through that type of door with a shoulder would be injured. The prosecutor then asked what level of force would be necessary to break tempered safety glass. Defense counsel objected again on the same grounds, but the court permitted the question. Dr. Wright went on to explain that a person could kick in a glass door.
Under Florida's Evidence Code, admission of Dr. Wright's opinion was proper. Section 90.702, Florida Statutes (1995), provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion; however, the opinion is admissible *815 only if it can be applied to evidence at trial.
In this case, the qualifications of Dr. Wright were explored prior to his testimony, and the testimony was connected to the facts which had already been introduced before the jury. When presenting expert testimony, a trial court has broad discretion in determining the range of subjects on which an expert witness can testify, and, absent a clear showing of error, the court's ruling on such matters will be upheld. See Finney v. State, 660 So.2d 674 (Fla.1995).
In this case, Dr. Wright used his scientific knowledge to assist the jurors in understanding whether the perpetrators of this crime would be injured by breaking through the sliding glass doors. The predicate for this testimony was laid by Dr. Wright's years of experience with glass and his extensive experience with injuries caused by it. The record shows Dr. Wright's opinion was based in scientific principle rather than being speculative. Furthermore, his statement was admissible to explain the evidence. Dr. Wright's opinion could be used to explain why neither perpetrator complained of being injured during the robbery as testified to by Latasha Jones. Dr. Wright's opinion also helped explain why Quezada did not notice injuries to Pagan when he saw him after the crime was committed. Pagan has not demonstrated that it was error to allow the expert to express his opinion in this area.

Cumulative Errors
Pagan argues his sentence of death should be reversed based on the cumulative errors which occurred during the proceedings in the trial court. As we stated in Bryan v. State, 748 So.2d 1003, 1008 (Fla.1999), "where allegations of individual error are found without merit, a cumulative-error argument based thereon must also fail." Because we have determined that only one error was demonstrated and that error was harmless, there is no ground for relief on this claim.

Proportionality
As his final argument, Pagan asserts the death sentence is disproportionate under the circumstances of this case. In deciding whether death is a proportionate penalty and to ensure uniformity in the imposition of death sentences, this Court reviews and considers all the circumstances in a case relative to other capital cases where a sentence of death has been imposed. See Johnson v. State, 720 So.2d 232 (Fla.1998); Urbin v. State, 714 So.2d 411, 416-17 (Fla.1998). Because the death penalty is reserved for those cases which are the most aggravating and least mitigating, we must examine those circumstances to determine the appropriate sentence.
In this case, the trial court found and weighed three aggravating circumstances: (1) the defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to some person (great weight); (2) the capital felonies were committed while the defendant was engaged in the commission of, or attempting to commit, the crimes of armed burglary and armed robbery (significant weight); and (3) the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (great weight). The trial court found one statutory mitigator: the existence of any other factors in the defendant's background that would mitigate against imposition of the death penalty. Under this "catch-all" mitigator, the trial court found that childhood deprivation had been established and afforded it some weight. Additionally, the trial court found the following nonstatutory mitigators: (1) the defendant has attention deficit disorder (little *816 weight); (2) the defendant has borderline personality disorder (some weight); (3) the defendant is a loving brother (little weight); (4) the defendant is a loving son, grandson, and great grandson (little weight); (5) the defendant engaged in good conduct while in custody awaiting trial (some weight); and (6) the defendant is a loving friend (little weight).
In arguing that death is a disproportionate penalty in this case, Pagan relies in part on Snipes v. State, 733 So.2d 1000 (Fla.1999). In Snipes, the trial court found two aggravating circumstances (CCP and the murder was committed for pecuniary gain), and substantial mitigation (age of seventeen, number of years of sexual abuse as a child, drug and alcohol abuse beginning at a young age, no prior violent history, raised in a dysfunctional, alcoholic family, many positive personality traits, emotional stress and personality disorder due to early childhood, voluntary confession to the crime and expression of remorse, roles of older individuals in arranging the crime, and the defendant's having been easily led by older persons). This Court reversed Snipes' death sentence in part because the circumstances of his case were so similar to those in Urbin v. State, 714 So.2d 411 (Fla.1998). In Urbin, there were two aggravating circumstances (prior violent felony and pecuniary gain) and a number of mitigating circumstances (age of seventeen, substantial impairment, drug and alcohol abuse, dyslexia, employment history, and lack of a father). In both Snipes and Urbin, this Court found the defendants' age of seventeen compelling when coupled with the defendants' history and the other mitigating circumstances.
This case is distinguishable from both Snipes and Urbin. Pagan was twenty-three at the time of the crimes and turned twenty-four one month later. The trial court examined the statutory mitigator of age and rejected it because testimony from a clinical psychologist did not reasonably convince the court that Pagan was unable to take responsibility for his acts and appreciate the consequences of his actions. The psychologist administered a full battery of psychological tests and reported that Pagan's score reflected a full scale IQ of 107, placing him in the top 92 percentile. The psychologist also testified that Pagan has a borderline personality disorder and that there is some developmental and psychological immaturity on his part. These factors do not make Pagan's age a "compelling" mitigating factor like the age of the defendants in Snipes and Urbin. Moreover, Snipes and Urbin involved two aggravating factors while this case involves more substantial aggravation.
Pagan also cites Sinclair v. State, 657 So.2d 1138 (Fla.1995), in support of his proposition that the death penalty is disproportionate in this case. In Sinclair, this Court remanded for the imposition of a life sentence primarily because only one valid aggravator was found to exist. Sinclair is distinguishable because in the present case the trial court properly found three aggravators, and thus Sinclair is not similar enough to compare to the facts of this case.
Pagan also argues that Scott v. Dugger, 604 So.2d 465 (Fla.1992), and Nibert v. State, 574 So.2d 1059 (Fla.1990), require the imposition of a life sentence. As the State points out, however, Pagan's reliance on Scott is misplaced. Scott involved a robbery and murder which were affirmed on direct appeal. On postconviction review, however, this Court revisited the proportionality review based on the life sentence received by a codefendant whom the majority of this Court believed was equally culpable for the murder. Pagan *817 makes no claim that Graham is equally culpable for the murder.
In Nibert, the trial court imposed the death sentence upon finding one aggravating circumstance and no statutory mitigating circumstances. This Court found the death sentence disproportional after finding additional mitigating evidence in addition to the fact that only one aggravator was present. Pagan argues that Nibert is factually analogous to the present case because Nibert, like Pagan, was so impaired during his life by alcohol that testimony indicated he was a completely different person sober rather than drunk. See 574 So.2d at 1062. Nibert, however, is distinguishable because only one aggravator was found to exist in that case.
The State asserts and we agree that the instant case is comparable to Shellito v. State, 701 So.2d 837 (Fla.1997), where a twenty-year-old defendant was convicted in a shooting death. The trial court found two aggravators (prior violent felony conviction and pecuniary gain/commission during a robbery), and nonstatutory mitigation consisting of alcohol abuse, a mildly abusive childhood, difficulty reading, and a learning disability. Similarly, in Melton v. State, 638 So.2d 927 (Fla.1994), the defendant committed murder during the course of a robbery. The trial court found two aggravators, no statutory mitigators, and two nonstatutory mitigators which were assigned little weight. See also Hudson v. State, 538 So.2d 829 (Fla.1989) (death sentence affirmed where the trial court found two aggravating circumstances and gave little weight to three statutory mitigating factors); Finney v. State, 660 So.2d 674 (Fla.1995) (sentence of death affirmed where trial court found three aggravating factors and five nonstatutory mitigating factors).
When compared to other cases where sentences of death have been affirmed, Pagan's death sentence is proportional. The trial court found three aggravators, affording all great or significant weight. In fact, this Court has recognized one of these aggravators, CCP, to be one of the "most serious" aggravators in the sentencing scheme. See Larkins v. State, 739 So.2d 90, 95 (Fla.1999). Pagan does not challenge the validity of any of the aggravators. Moreover, Pagan's case lacks significant mitigation. After carefully considering the totality of the circumstances in this case in light of this Court's prior decisions in other capital cases, the jury's recommendation, and the trial judge's weighing of the aggravating and mitigating circumstances, we find death a proportional penalty in this case.

Conclusion
For the reasons stated above, Pagan's convictions for two first-degree murders, two attempted first-degree murders, armed burglary and armed robbery are affirmed. We also affirm the imposition of a death sentence for each of the first-degree murder convictions.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS, and QUINCE, JJ., concur.
NOTES
[1] Pagan was also convicted of two counts of attempted first-degree murder, armed burglary, and armed robbery.
[2] Willie Graham's nickname is Shaikwam.
[3] Quezada interpreted this statement to mean that they were going back to the same residence and get the things they had not gotten the first time.
[4] Quezada said there was a "gunpowder" smell present when he opened the door to Pagan.
[5] Jackson said he had observed both Pagan and Graham with firearms during the period between January 23 and February 23.
[6] Spencer v. State, 615 So.2d 688 (Fla.1993).
[7] In the sentencing order the trial court discussed another aggravator, that the murder was committed to avoid arrest, but found that this aggravator was not proven beyond a reasonable doubt.
[8] Williams v. State, 110 So.2d 654 (Fla.1959).
[9] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
[10] Richardson v. State, 246 So.2d 771 (Fla. 1971).
[11] See Meyers v. State, 704 So.2d 1368 (Fla. 1997); Hardwick v. State, 521 So.2d 1071, 1075 (Fla.1988).
[12] The fingerprint expert indicated the thumb prints on the receipts matched Graham's, but the handwriting did not.
[13] Pagan also includes a short argument in his initial brief alleging that the police officers failed to knock and announce their presence. This issue was not argued in the trial court and therefore has not been preserved for appellate review. Moreover, Detective Peluso testified that he said, "Police, search warrant" and entered the residence through the unlocked door.
[14] Anthony Graham is Willie Graham's cousin.
[15] Part of that agreement included the dropping of perjury charges.
[16] Although there was no challenge to Laster, the defense attempted to use peremptory strikes on prospective jurors Dixon and Spencer. The State raised objections to the strikes under State v. Neil, 457 So.2d 481 (Fla.1984). The trial court allowed the strike of Dixon because he had been the victim of a crime. The strike of Spencer was not allowed because the record did not demonstrate that the juror could not be fair and impartial. Pagan has not demonstrated that the trial court's ruling on these peremptory challenges was in error.
[17] The claims in Pagan's motion for new trial included: (1) admission of Williams rule evidence of the dissimilar January 23, 1993, burglary was erroneous; (2) the trial court erred in denying the defense motion to suppress physical evidence; (3) the trial court erred in denying the defense motion to suppress statements made by Pagan without having received warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); (4) the trial court erred in denying the defense motion to dismiss the indictment on the ground that it was based on prejudice and illegal eavesdropping; (5) the trial court erred in denying Pagan's motion to dismiss based on the vagueness of the indictment; (6) the trial court improperly upheld the State's Neil challenge when the defense offered a race-neutral reason to justify challenging juror Laster; (7) the trial court improperly permitted inflammatory and prejudicial photographs to be shown of the deceased; (8) the trial court erred in denying several of Pagan's motions for mistrial based on excessively leading questions the State asked of state witnesses; (9) the trial court erred in denying a mistrial based on a violation of Richardson v. State, 246 So.2d 771 (Fla.1971) when Deputy McPhaul was allowed to testify regarding the live lineup procedures; (10) the trial court erred in allowing the State to introduce over defense objection a tape-recorded statement of Antonio Quezada which did not constitute a prior consistent statement hearsay exception; (11) the trial court erred in permitting testimony and physical evidence to be admitted concerning Willie Graham; (12) the trial court erred in denying Pagan's motion for judgment of acquittal when the State failed to meet its burden of proof; (13) the trial court erred in denying Pagan's motion for mistrial when the prosecutor, in closing, made an improper golden rule argument; (14) the trial court erred in denying Pagan's motion for mistrial when the prosecutor, in closing, referred to a camouflage jacket from the Desert Storm military operation that was not in evidence and highly prejudicial; (15) the trial court erred in permitting the prosecutor to ask inflammatory questions of Keith Jackson relating to the death of six-year-old Michael Lynn; (16) the trial court erred in prohibiting reverse Williams rule evidence of a burglary committed by Keith Jackson.
[18] In his reply brief, Pagan states fundamental error occurred in the admission of this photographic evidence. However, there is no elaboration beyond this statement. The record reveals that photographs of the child victim were introduced during the medical examiner's testimony to show the nature and extent of his injuries. The defense objected to one photograph as cumulative and the State withdrew the photograph. Photographs of the body were displayed during the testimony of Craig Bonazeck, a Miramar police officer, and Charles Del, an employee with the Broward County Sheriff's Office, and no objections were made.
[19] Pagan also raises a substantive issue concerning the admission into evidence of testimony surrounding the voice lineup. There was no contemporaneous objection to this evidence; therefore, the issue has not been preserved for appellate review and will not be discussed further.
[20] The State asserts in its answer brief that defense counsel did depose the witness prior to her testimony at trial.