MAY, C.J.
A double homicide resulted in the defendant’s conviction on two counts of first degree murder and concurrent life sentences. The defendant now appeals his conviction, raising two issues: (1) the trial court erred in denying his request to have a co-defendant declared unavailable to testify or take judicial notice of the charges against the co-defendant to which he had pled, and the sentence imposed; and (2) the trial court erred in denying his motion *1095 for judgment of acquittal on the murder of the male victim. We affirm.
The murders occurred at a residence, where a witness shared space. On the night before the murders, the witness shared a bottle of brandy, smoked marijuana, and snorted cocaine with a friend. Unable to go to work the following evening, she slept in the back bedroom through most of the day. She awoke to the sound of a gunshot from the living room. When she came out of the bedroom, she saw ten to fifteen men in the kitchen, including the co-defendants. There were trash bags and guns on the table. One co-defendant, who was holding a small automatic handgun, laughed and said it was all a mistake. The witness then got a soda and went back to sleep.
An hour or two later, the witness awoke to the sound of a second gunshot from the living room. This time she saw a man’s feet on the floor. Another co-defendant stood over the man holding a revolver. When she asked what was going on, one of the co-defendants told her to go back into the bedroom.
The witness then looked out the front door and saw another co-defendant and the defendant fighting with a woman. They were trying to drag her back into the house. The co-defendant was holding the woman’s head down and the defendant had her by the legs with a gun to her stomach. She heard the woman scream and beg for her life. The witness returned to the bedroom.
After hearing the door close, and thinking everyone had left, the witness came out, but one of the co-defendants was still there with the revolver. She went into the closet and threw clothes on top of herself. She heard the door open and close a second time. She looked out the door again and saw the defendant shoot the woman, whom she had seen outside a few minutes before. The witness then heard the men discuss removing the bodies. She saw brake lights back up to the house and the defendant and one of the co-defendants take the bodies outside.
After staying with a friend for the weekend, the witness turned herself in on an outstanding violation of probation warrant. She also gave a recorded statement of what she saw and heard on the day of the murders and looked at four photographic lineups. The witness admitted at trial that she did not see the defendant in the room with the male victim.
A neighbor across the street saw a green Ford Expedition[1] parked behind a silver car[2] in the driveway of the home where the murders occurred. The neighbor saw a man pulling a woman from the silver car. She later identified him as the man she had seen in the Ford Expedition. She said the man threw the woman onto the “floor” and slapped her to the left and the right. The neighbor heard the woman call for help and ask for someone to call the police. She described the woman as hysterical, screaming, and scared. The man told the neighbor not to worry because the woman was his wife. The neighbor was going to call the police, but thought about her children and the type of area it was, and decided not to get involved.
The neighbor witnessed the female victim wrap her legs around a pole to keep from being taken inside. The victim kept *1096 repeating “Please.... Don’t take me there. I don’t want to go.” The co-defendant pried the victim’s legs off the pole while the defendant held her arms. They threw her into the house and closed the door.
The neighbor later saw the same two men bring the woman out of the house. She was limp and not moving when the two men threw her into the trunk of the car. The neighbor saw the co-defendant go back into the house; the defendant fired a gun into the trunk of the car before closing it.
The neighbor packed up her children and started to leave. She passed the defendant, who had parked his vehicle and was walking back toward the house. She then went to the police station, reported the incident, and gave a statement. She identified the silver car as the vehicle into which the men had placed the woman’s body. She identified people in each lineup, including one co-defendant and the defendant.
Yet another neighbor saw the green Ford Expedition pull up with a rifle pointed out the window. The defendant and co-defendant each had guns and jumped out of the vehicle, grabbed the woman, and took her into the house. After the door closed, this neighbor heard a female scream and then say “don’t kill me, I have a son.” He then heard a gun go off “more than a couple” of times.
The neighbor saw a co-defendant back a silver Charger up to the door of the house and saw the defendant and co-defendant throw the bodies in the trunk. The defendant and co-defendant left in the silver Charger. The neighbor also gave a statement to police and made identifications from photo lineups.
Amother witness at a different location saw three males get out of a silver car. Two men put on gloves and wiped the inside and outside of the car, including the doors. They backed the car close to the wall of the house and banged on the back with rocks. The men left for a few minutes and returned with drinks. They took out white bags, which they placed under their shirts. The men stood there on the phone until a red car pulled up.
The witness reported the information to law enforcement, who responded to the scene. They found a silver car with bricks on the trunk lid and blood on the bumper, quarter panel, and tag area. When the officer opened the trunk, he found two bodies inside.
During the late stages of the State’s case, defense counsel discussed with the trial judge whether the defense would be permitted to call one of the co-defendants, who had already entered a plea. The co-defendant — who was in the county jail— took the stand outside of the jury’s presence, and told the court he would not answer any questions. Defense counsel then requested the court to declare the witness unavailable and/or take judicial notice of his charges, the plea, and his sentence. The trial court denied the request. Defense counsel renewed the request later in the trial.
The defendant moved for judgment of acquittal on both counts of the indictment, arguing the State had failed to establish a prima facie case. Specifically, as to count one, the defendant argued the State failed to establish that he was either present at the time the male victim was killed or that the death was part of a plan or conspiracy under the principal theory. The court denied the defendant’s motions and renewed motions for judgment of acquittal.
The jury convicted the defendant on both counts. On each count, the jury specifically found that the defendant possessed and discharged a firearm; and, as a *1097 result, he actually inflicted death upon each of the victims. The jury recommended a sentence of life in prison without the possibility of parole on each count. The court denied the defendant’s motion for new trial and imposed concurrent minimum mandatory life sentences.
On appeal, the defendant argues the trial court erred in two instances. First, the court should have taken judicial notice of the co-defendant’s plea and sentence. Second, the trial court erred in denying the defendant’s motion for judgment of acquittal. We find no error and affirm.
The trial court properly denied the defendant’s request to either call the co-defendant as a witness or take judicial notice of his charges, his plea, and his sentence as this evidence was irrelevant. Heath v. State, 648 So.2d 660, 664 (Fla.1994) (“The trial court has broad discretion in determining the relevance of evidence and such determination will not be disturbed absent an abuse of discretion.”).
We also find no error in the trial court’s denial of the defendant’s motion for judgment of acquittal. “A de novo standard of review applies when reviewing a motion for judgment of acquittal. ‘Generally, an appellate court will not reverse a conviction which is supported by competent, substantial evidence.’ ” Galavis v. State, 28 So.3d 176, 178 (Fla. 4th DCA 2010) (quoting Pagan v. State, 830 So.2d 792, 803 (Fla.2002)) (citation omitted).
“Under [Florida] law, both the actor and those who aid and abet in the commission of a crime are principals in the first degree. To be guilty as a principal for a crime physically committed by another, one must intend that the crime be committed and do some act to assist the other person in actually committing the crime.” Staten v. State, 519 So.2d 622, 624 (Fla.1988) (citations omitted).
Here, there was more than sufficient evidence to support the defendant’s conviction as a principal to the murder of the male victim, and as the shooter of the female victim. While no one saw the defendant shoot the male victim, the defendant was at the scene, helped carry the bodies out of the house and place them in the trunk of the car, and shot into the trunk after the bodies were placed there. The defendant’s car strategically blocked the silver car to prevent it from leaving. And, witnesses saw the defendant shoot the female victim. Because the defendant participated with two others in a common criminal scheme, he is guilty of all crimes committed in furtherance of that scheme— regardless of whether he actually participated in the murder of the male victim.
Accordingly, we affirm the defendant’s conviction and sentence.

Affirmed.

STEVENSON and GROSS, JJ., concur.

. The defendant’s grandmother testified that the defendant drove the green Ford Expedition away from her home on the day of the murders.

. Different witnesses refer to the color of the car as silver or gray; for ease of reference the car will be referred to as "silver.”