917 So.2d 927 (2005)
I.M. a child, Appellant,
v.
STATE of Florida, Appellee.
No. 1D05-2001.
District Court of Appeal of Florida, First District.
December 14, 2005.
*928 Nancy A. Daniels, Public Defender; David P. Gauldin, Assistant Public Defender, Tallahassee, for Appellant.
Charlie Crist, Attorney General; and Sherri Tolar Rollison, Assistant Attorney General, Tallahassee, for Appellee.
PER CURIAM.
The appellant, a juvenile, was adjudicated delinquent of one count of first-degree arson, a violation of section 806.01(1)(b), Florida Statutes (2004); and one count of burglary to a dwelling or structure, with the intent to commit the offense of arson and/or criminal mischief and with damage over $1,000.00, a violation of section 810.02(2)(c)2., Florida Statutes (2004). The charges arose from incidents on January 31, 2005, when the locked building enclosing the band/choir room at Ribault Middle School in Jacksonville was unlawfully entered and a fire was set inside the band/choir room, causing extensive damage to the building and the property inside. Appellant asserts as error 1) the trial court's denial of his motion for judgment of dismissal on the charge of first-degree arson and 2) the trial court's restitution order in the amount of $110,023.00. We affirm the adjudication of delinquency as to both offenses and the commitment to a level of moderate risk. We affirm the restitution order in part, vacate the order in part, and remand for further proceedings in accordance with section 775.089, Florida Statutes (2004).

Motion for Judgment of Dismissal
Appellant does not challenge the finding of delinquency for one count of burglary to a dwelling or structure with damage in *929 excess of $1,000.00, which is a first-degree felony. See § 810.02(2)(c)2., Florida Statutes (2004). In his first issue, Appellant contends that the trial court erred by denying his motion for judgment of dismissal on the one count of first-degree arson. The amended petition alleged that Appellant "did willfully and unlawfully, or while in the commission of a felony, by fire or explosion, damage or cause to be damaged a structure, or the contents thereof, where persons are normally present, to-wit: RIBAULT MIDDLE SCHOOL, contrary to the provisions of Section 806.01(1)(b), Florida Statutes." This statutory subsection defines first-degree arson to include a person's damaging, or causing to be damaged, "willfully and unlawfully, or while in the commission of any felony, by fire or explosion," "[a]ny structure, or contents thereof, where persons are normally present, such as ... educational institutions during normal hours of occupancy...."
We review de novo the trial court's ruling on a motion for judgment of acquittal. See Pagan v. State, 830 So.2d 792, 803 (Fla.2002); Jones v. State, 790 So.2d 1194 (Fla. 1st DCA 2001). The same standard of review applies in the context of juvenile adjudicatory proceedings, although the motion is properly designated a motion for judgment of dismissal. See Fla. R. Juv. P. 8.110(k); J.P. v. State, 855 So.2d 1262, 1264 n. 1 (Fla. 4th DCA 2003); W.E.P. v. State, 790 So.2d 1166, 1169-70 & n. 3 (Fla. 4th DCA 2001). If, upon reviewing the evidence in a light most favorable to the State, a rational fact-finder could find the elements of the crime proven beyond a reasonable doubt, then the evidence is sufficient to sustain the adjudication of delinquency. See Banks v. State, 732 So.2d 1065 (Fla.1999).
The State's evidence showed that on the afternoon of January 31, 2005, an 11-year-old (whom we refer to as "A" due to his protected status as a juvenile) was at the middle school for an after-school "team ball" class program. On that day, he skipped that particular activity and was standing with several friends outside the building housing the band room. After someone remarked that "a thing [was] on top of the roof" of the building enclosing the band room, "A" and another of the boys (whom we designate as "G") climbed to the rooftop and entered the hatch leading down into the band or chorus room. When they realized they were in the band room, "G" said they needed to get out of there. As "A" and "G" were exiting through the door of the band room and walking toward a gate, they observed some older boys, including Appellant. At the older boys' request, "A" and "G" held open the door. After three of the boys, including Appellant, entered through the band room door, "A" (who had remained outside) heard "cracking" and "crashing" noises, as if things were being thrown around. "A" heard "G" say something about leaving fingerprints. Later, while Appellant was still inside the band room, "A" heard someone inside the room yell "Set it on fire." After the fire was set, "A" saw the older boys running out of the band room. Subsequently, "A" recounted these events to a detective.
"G," age 12, testified he was on the middle-school campus on that afternoon for a "Team Up" program providing homework assistance. "G" was with several friends when "A" mentioned that he knew a way to get inside the choir room, after which several of the boys jumped the fence and scaled the roof. "G" and "A" came down into the choir room; soon afterwards, some other boys asked "G" to hold open the door. "G" testified that Appellant was one of the boys who were standing right by the door to the choir room. Afterwards, "G" heard loud sounds of *930 stomping and chairs falling. He remarked to "A" that those boys were going to leave fingerprints. Later, "G" told this story to a detective.
"D," age 11, testified that on the same afternoon, he was on campus for an after-school program with "A" and "G" and two other friends who were playing near a fence by the courts. "D" (who had remained outside) testified that he saw "A" holding open the door to the choir room for some older boys, including Appellant, who walked inside and started throwing objects and breaking trophies and other glass objects. With the door to the room open, "D" was able to see inside. He heard one of the boys say something about fingerprints. He also heard someone say "Give me a lighter, I'm about to burn this." When that statement was made, Appellant and the other older boys were still inside the room. "D" testified that he had seen Appellant running out of the choir room with everyone else as the smell of smoke became apparent. When "D" first saw them, the older boys were smoking cigars. One of the boys other than Appellant had a lighter in his hand. "D" subsequently gave a written statement to a detective.
Dale Burford, a Jacksonville fire investigator, testified that he had responded to a call at the middle school after the fire was extinguished. His district chief reported that persons who were not supposed to be in the room had been there when the fire started, and the authorities suspected the fire had been intentionally set. Reports indicated that some individuals had been on the building roof shortly before the fire started. After observing the damage inside the choir room, Mr. Burford determined that the fire's point of origin was the south center wall by the lockers where the uniforms were kept. After cleaning the area and finding no source of ignition (e.g., chemical, electrical, combustible, lightning), the investigators concluded that the fire had been set intentionally, not accidentally. The door to the damaged room had been locked.
Detective John Harness, who worked in community affairs for the Duval County School Board, testified that he had been called to the middle school around 6:00-6:30 p.m. on the date of the incident to speak to some students whom the authorities had detained. Relying on certain information given to him, the detective contacted Appellant, whom he identified in court. Before the interview, Detective Harness gave Appellant a written Miranda rights form and read aloud the rights, after which Appellant signed the form and willingly, knowingly gave oral and written statements about the incident. At the adjudicatory hearing, Detective Harness read aloud Appellant's statement indicating that Appellant and three other boys had been walking together when they saw "G" and another younger boy exiting the classroom. Appellant was told that the younger boys had entered the room through the roof hatch. After the door was opened for them, Appellant and his three compatriots entered the room and started removing items from the wall and throwing objects around the room. When they arrived at the building, the boys had been smoking a tobacco product. According to Appellant's statement, at "M's" request, Appellant had handed him a lighter. Observing "M" setting the robes afire, Appellant left the room. Appellant said that "M" had told him how the chorus room was set aflame. One of the boys told the detective about having heard one of the older boys say "We're going to burn this mug down."
The middle school vice-principal, Addison Davis, testified that school got out at 2:25 p.m. On the afternoon of the band/ choir room fire, which occurred after 4:00 *931 p.m., school was not in session. The "Team Up" after-school program was the only activity going on then. The witness testified that no one was supposed to be in the back area of the building where the fire occurred. That building, which is attached to the gymnasium, was locked and was supposed to be empty.
After the State rested its case, defense counsel moved for a judgment of dismissal on the charge of first-degree arson on two grounds: 1) that the State had not proved the arson was in a structure where persons are normally present and during normal hours of occupancy; and 2) that the State had not shown that Appellant was a "principal" with a conscious intent to commit a criminal act. The "structure" in question is the school building that includes the band/chorus room in which the fire originated. See § 806.01(3) (defining "structure" to include "any building of any kind"). The testimony that the middle school normally got out at 2:25 p.m. and the fire was started sometime later that afternoon does not dispose of the issue of whether the evidence satisfied the requirements of section 806.01(1)(b). A comparison of two provisions in the arson statute demonstrates that the Florida Legislature designated as arson in the first degree (a first-degree felony) an act of arson in "[a]ny dwelling, whether occupied or not, or its contents"; in "[a]ny structure, or contents thereof, where persons are normally present, ... during normal hours of occupancy"; or in "[a]ny other structure that [the perpetrator] knew or had reasonable grounds to believe was occupied by a human being." See § 806.01(1)(a)-(c). In contrast, the Legislature designated as arson in the second degree (a second-degree felony) an act of arson "under any circumstances not referred to in subsection (1)." See § 806.01(2). This distinction in the degree of the felony (and in the corresponding degree of the arson itself) acknowledges a legislative recognition of the more serious nature of an act of arson in dwellings or other structures where people are known to be present, or reasonably should be expected to be present, or normally are present.
Although the undisputed testimony indicated that the building enclosing the band/chorus room was locked and was not supposed to be occupied by anyone when the initial intruders entered through the roof hatch and descended to the room, the evidence (viewed in a light most favorable to the State) established that a number of individuals were on the grounds of the middle school for scheduled after-school activities. Several boys, including Appellant, were gathered outside the building in question. Eventually, with the assistance of the initial intruders, who opened the locked door of the building from the inside, Appellant and some other boys entered the structure and were present when the fire erupted. The State proved that Appellant was a "principal" in the commission of a felony and willfully, unlawfully damaged or caused to be damaged by fire a structure (and its contents) "where persons are normally present" and "during normal hours of occupancy." Given both the nature of the danger described in section 806.01(1) damages "by fire or explosion"and the evidence that persons were on the campus in the immediate vicinity of the damaged structure on the afternoon when the fire was set, Appellant construed the statute too narrowly by asserting in the motion for judgment of dismissal that the State failed to prove first-degree arson. Under the defense's reasoning, if a perpetrator were to enter an otherwise empty school classroom and cause a fire or explosion after normal school hours, but when students and/or teachers normally occupy, i.e., gather in, the area just outside the classroom *932 building for other after-school activities, the act would not constitute first-degree arson. Such reasoning is directly contrary to the legislative decision to classify as more serious those acts of arson in structures where and when people are more likely to be present. Therefore, the trial court properly rejected Appellant's first argument for a judgment of dismissal.
The defense argued, second, that the State had not proved that Appellant was a "principal." According to the well-established law of principals:
One who participates with another in a common criminal scheme is guilty of all crimes committed in furtherance of that scheme regardless of whether he or she physically participates in that crime.
Jacobs v. State, 396 So.2d 713, 716 (Fla. 1981); see § 777.011, Florida Statutes (2004) ("Whoever commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, ... or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree and may be charged, convicted, and punished as such, whether he or she is or is not actually or constructively present at the commission of such offense."); see Davis v. State, 275 So.2d 575, 577-78 (Fla. 1st DCA 1973). The evidence established Appellant's willing participation or conscious intent for the delinquent act to be done. Appellant misplaces his reliance on "mere presence" decisions such as Shuler v. State, 801 So.2d 1055 (Fla. 1st DCA 2001). Accordingly, the trial court correctly denied the motion for judgment of dismissal.

Restitution Order
On the first day of the two-day restitution proceedings, John Merrill, who was employed in the maintenance department of the Duval County public school system, testified that he was the supervisor of maintenance at Ribault Middle School and was overseeing the recovery efforts after the fire. Mr. Merrill testified that the goal was to restore the facility to its original pre-fire status, not to improve it or add on to it in any way. Mr. Merrill testified that he had paid out certain monies for repair work that was already completed, and he had been able to get estimates for the unfinished work, which was expected to be completed in about three weeks. At that point in the hearing, defense counsel interjected that amounts already paid needed to be distinguished from the estimated amounts for unfinished repair work. The witness indicated he had estimates but did not know the "actual total cost" of what already had been spent for repairs. Mr. Merrill testified he could get the "actual costs" from the school's work order system and could bring those amounts to the follow-up hearing. The trial judge announced that he needed to know "the total cost" or "the total loss," i.e., "what it cost the Duval County School System, for labor, materials, and personal property replacement." According to Mr. Merrill, the only "hard invoices" represented a payment to Serv-Pro in the amount of $28,123.93 for the initial clean-up work.
Mr. Merrill estimated that the school would have to spend a total of $67,841.81 for the reconstruction of the facility itself, a figure that did not include the damage to the property inside the band/choir room. Upon the trial judge's request for itemized estimates of the cost of the building restoration, Mr. Merrill presented the following repair work and figures, which total $67,841.81: carpentry for ceilings and floors ($27,118.00); electrical work, running new conduits, furnishing new lights ($5,435.00); electronics, a new clock system, and a new running conduit for the computer systems ($667.00); initial overtime *933 response to the fire alarm ($228.60); technology and new fiber-optic lines ($500.00); painting ($1,473.00); overtime for the initial response to the fires ($951.00); mill shop work to make new cabinets ($2,500.00); air conditioning work, including the replacement of accumulators and contactors ($845.28); and the initial clean-up by Serv-Pro ($28,123.93).
The co-defendant's attorney then objected (with the express concurrence of Appellant's counsel) "to any of the funds that have not yet been expended," i.e., to the itemized estimated costs of $39,717.88 ($67,841.81-$28,123.93). Counsel announced that he was assuming the witness had not produced the estimates himself, and that the restitution order should reflect only "the actual cost." The objection was overruled, and the proceedings concluded for the day.
The restitution hearing re-commenced on the second day when Mr. Merrill testified that in addition to the $67,841.81 for physical reconstruction and initial clean-up work, which he had addressed in the previous day's testimony, $42,182.50 in damages were incurred for the property inside the room. The $42,182.50 figure represented three pianos, music folders, chairs, chorus robes, risers, back rails for risers, plastic flute-like recorders, dry eraser boards, bulletin boards, and roller carts for music stands. The witness stated that the cost of the pianos was obtained from the school board's property asset branch and represented "the purchase price." The Shenandoah Robe Company provided the cost figures for the choir robes. The current catalogue of the Wanger Corporation (which had a contract with the State) provided the cost of the other music equipment and materials.
Given the two days' testimony, the trial judge orally announced:
So we have $67,841 from the actual physical reconstruction. And then for property we have $42,182 leaving us a total of $110,023 that these parents are going to be responsible for.
Appellant's mother was not present at the second day of the restitution hearing. After the co-defendant's mother stated that she had no questions for Mr. Merrill regarding the costs of building reconstruction or property replacement/repair, the trial judge reiterated that restitution was being ordered in the amount of $110,023.00.
Defense counsel then objected on the ground that the prices to which Mr. Merrill testified "today" were "new prices" rather than fair market value (FMV) prices. Regarding the evidence that was presented "yesterday," defense counsel reiterated his objection that everything other than the $28,123.93 already paid to Serv-Pro was "just an estimate." Counsel expressed his uncertainty as to whether Mr. Merrill had first-hand knowledge of whether the $28,123.93 had actually been paid. Implicitly overruling the objection, the trial court entered a restitution order in the amount of $110,023.00, for which the co-defendants and their parents were to be jointly and severally responsible, to be paid in $100.00 monthly installments. See Spivey v. State, 531 So.2d 965 (Fla.1988) (acknowledging trial court's discretion to require defendant to pay full amount of restitution, or apportion restitution in appropriate amount, where defendant commits criminal offense in concert with others); Bourget v. State, 634 So.2d 1109 (Fla. 2d DCA 1994) (finding no abuse of discretion in trial court's making defendant jointly and severally liable with co-defendants in imposing restitution). At the conclusion of the second day of the restitution proceedings, defense counsel objected on the ground that the evidence on restitution is legally insufficient because the State relied *934 on hearsay evidence and mere estimates and failed to establish the FMV of the property in question.
For the first time on appeal, Appellant contends that the record failed to show that Appellant or his mother could reasonably expect to pay the amount of restitution ordered. Because Appellant did not object to the amount of restitution on this ground, this argument ordinarily would not be preserved for appellate review. See Spivey, 531 So.2d at 967 n. 2; Gliszczynski v. State, 654 So.2d 579 (Fla. 5th DCA 1995). This case does not involve fundamental error. See Spivey, 531 So.2d at 967 n. 2. However, because further proceedings will be permitted in the trial court on remand regarding the restitution issue, we conclude that inquiry should be made then on the issue of Appellant's and his mother's ability to pay. See Abbott v. State, 543 So.2d 411, 413 (Fla. 1st DCA 1989) (stating that although defendant failed to present evidence of his own and his dependents' financial resources for purposes of restitution statute, suggesting waiver of issue of inability to pay, inquiry should be made on remand because evidentiary hearing on value of stolen items would be necessary anyway).
We affirm without further discussion the $28,123.93 in restitution based on the amount already paid to Serv-Pro for initial clean-up services. We affirm also the $39,717.88 in restitution relating to building reconstruction, as the specific ground for defense counsel's objection below is not argued on appeal, and is thereby waived, and the specific ground argued on appeal was not presented and preserved in the trial court. See Ladd v. State, 715 So.2d 1012, 1014 (Fla. 1st DCA 1998) (noting that issue is not preserved where grounds for objection argued at trial differ from those argued on appeal).
It was only during the second day of the hearing, when Mr. Merrill testified regarding the damages inside the choir/ band room, that defense counsel objected on the ground that the maintenance supervisor's valuations of the destroyed property were not based on FMV, and the State properly acknowledges that this argument was preserved for our review. Unless "special circumstances" are shown, FMV (rather than replacement value) is the appropriate measure of damages in calculating restitution. See Walters v. State, 888 So.2d 150, 151 (Fla. 5th DCA 2004); Domaceti v. State, 616 So.2d 1148 (Fla. 4th DCA 1993) (stating that restitution amount should be established with evidence of FMV at time of theft, absent circumstances showing FMV would not adequately compensate victim or otherwise serve purpose of restitution); Hercule v. State, 655 So.2d 1256 (Fla. 3d DCA 1995) (finding that Hawthorne exception to FMV rule applied, so that victim was entitled to $1,400.00 in restitution based on "actual cost" of stolen specialty chrome wheels and car tires that victim had purchased only two weeks before defendant burglarized the vehicle). Rather than challenge Appellant's contention that the State failed to establish FMV, the State asserts in a conclusory manner that the instant case presents "unique circumstances," such that FMV "would not adequately reflect the victim's loss." State v. Hawthorne, 573 So.2d 330, 333 & nn. 4-5 (Fla.1991).
We reverse the award of $42,182.50 in restitution for damage inside the room on the grounds 1) that the State failed to establish the FMV of the damaged property; 2) that the State failed to show how, or why, the damages in question involved special circumstances of the type contemplated in Hawthorne to justify making an exception here to the general FMV rule; and 3) that the trial court provided no explanation *935 as to why the FMV should not govern the determination of restitution, and whether the court had considered any "other factors which it deems appropriate" under Hawthorne, 573 So.2d at 333. No such extenuating factors are apparent in the record on appeal. The State has the burden to demonstrate "the amount of the loss sustained by a victim as a result of the offense." § 775.089(7), Fla. Stat. Given these deficiencies in the State's evidence, we conclude that the trial court abused its discretion by awarding restitution in an amount greater than $67,841.81 ($28,123.93 plus $39,717.88).
We AFFIRM the adjudication of delinquency and the commitment of Appellant to the Department of Juvenile Justice at the moderate-risk level, AFFIRM the restitution order in part, REVERSE the restitution order in part, and REMAND for further proceedings on the issue of restitution.
DAVIS, BROWNING and LEWIS, JJ., concur.