DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**DANSON EXANTUS-BARR,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D14-2889

[April 6, 2016]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Jeffrey J. Colbath, Judge; L.T. Case No. 50-2013-CF006645AXXMB.

Carey Haughwout, Public Defender, and Patrick B. Burke, Assistant Public Defender, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Cynthia L. Comras, Assistant Attorney General, West Palm Beach, for appellee.

GROSS, J.

Danson Exantus-Barr appeals his convictions of robbery with a firearm while wearing a mask and a weapons possession charge. He contends that he was unlawfully stopped and sought to suppress his own statements, the victim's identification, and the seized property. The trial court denied his motion to suppress. We affirm, concluding that the totality of the circumstances, which included the location tracking of the victim's stolen iPhone through the use of a "Find My iPhone" app, gave rise to a reasonable suspicion to stop appellant.

"The standard of review applicable to a motion to suppress evidence requires that this Court defer to the trial court's factual findings but review legal conclusions de novo." *Backus v. State*, 864 So. 2d 1158, 1159 (Fla. 4th DCA 2003). "[A] trial court's ruling on a motion to suppress comes to the appellate court clothed with a presumption of correctness, and the reviewing court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling." *Pagan v. State*, 830 So. 2d 792, 806 (Fla. 2002).

After midnight, the victim was walking home from his restaurant job when he was accosted at 36th Street and Broadway in West Palm Beach by two persons dressed all in black and with bandanas around their faces. They told the victim to give them everything he had. The victim had no money, so they took his watch and iPhone 4. After they took the phone and watch, one person shot at his feet and told him "get the f___ out of here, white boy."

The duo fled southbound on Broadway. The victim ran to the nearest phone and called 911. He provided the 911 operator with a description of the individuals, and also gave the operator his username and password to track his iPhone. The victim explained that he had an app on his phone, "Find my iPhone," that worked essentially as a GPS tracker for his phone.

The police arrived at the scene within 5 minutes. The victim gave one officer the same description of the individuals that he gave to the 911 operator. The victim described one of the robbers as "a black male, approximately six foot tall, thin build, short-cropped hair, wearing a black shirt, blue jeans, prescription glasses and a black bandana covering his face from the nose down." The other was "a black male, medium build." A BOLO was put out with the description of the suspects and the direction they ran.

At the suppression hearing, a second officer dispatched to the robbery scene explained the mechanics of the "Find my iPhone" app:

> So the way this program works is it actually will tie in to where the location of it is, and then it'll give you an overhead view of –either like a TomTom overview, or a Google Earth overview, some type of view of it, along with a map of the roadways similar to what Mapquest is most known for.

Using the victim's username and password, the second officer began tracking the stolen iPhone on his own iPhone through the app. The phone was "live," meaning that the officer was getting a return signal of the phone's location. He directed other units in the area and "gave them the general area of where the phone was at." With this information, the other units established a perimeter in the vicinity of Broadway between 26th and 27th Streets.

The second officer crossed 27th Street and saw the same building reflected on the overhead view of the app. Next to the building, he saw three people standing where the app indicated the phone was located. There was no one else nearby. Two of the three individuals separated from

the other, and walked toward the building; the other individual walked toward the parking lot area. All made eye contact with the second officer. After he lost sight of the two men, the phone stopped transmitting a signal. Officer Matias testified that the signal stops when the iPhone is turned off.

The second officer then saw the three individuals get into a Ford Mustang in the parking lot and begin to pull away. At least two of the persons in the Mustang were similar to the description provided to the officer by the BOLO. The second officer motioned for the vehicle to stop, which it did. He waited for the other officers to come and assist him.

Appellant was the front passenger of the vehicle. When the second officer approached the car, he saw two items described by the victim—prescription glasses and a bandana. The watch and iPhone were later recovered. As a result of the stop, appellant and a codefendant were arrested.

Based on the totality of the circumstances, the trial court determined that there was reasonable suspicion to stop the Mustang. We agree with the trial judge's ruling.

"[A]n officer may conduct an investigatory stop based on specific and articulable facts that point to a reasonable, well-founded suspicion that a person has committed, is committing, or is about to commit a crime." *Jean v. State,* 987 So. 2d 196, 198 (Fla. 4th DCA 2008). "A mere hunch or suspicion is not enough to support a stop." *Id.*

> In determining the legality of a stop as a consequence of a BOLO, this court has looked to factors such as the length of time and distance from the offense, specificity of the description of the alleged perpetrator(s), the sources of the BOLO information, the time of day, absence of other persons in the vicinity of the sighting, suspicious conduct, and any other activity consistent with guilt.

*Id.* "A founded suspicion is a suspicion which has some factual foundation in the circumstances observed by the officer when interpreted in light of the officer's knowledge." *Watts v. State*, 468 So. 2d 256, 257 (Fla. 2d DCA 1985). "Whether an officer's suspicion is reasonable is determined by the totality of the circumstances which existed at the time of the stop and is based solely on facts known to the officer before the stop." *Slydell v. State*, 792 So. 2d 667, 671 (Fla. 4th DCA 2001).

Appellant relies on *Slydell* to argue that the second officer was acting on no more than a hunch, but that case is distinguishable. In *Slydell* there was no victim reporting a crime and no BOLO describing perpetrators, only the officers' "hunch" that the defendant was a trespasser. The defendant in *Slydell* was stopped by law enforcement because an officer "did not recognize [Slydell] as someone he had ever seen in the area." *Id.* at 669. "The officers testified that they frequently patrolled the area, but they did not claim to know all of the residents by sight. Moreover, they acknowledged that 'it's a highly transient area.'" *Id.* at 672. Given this flimsy basis for the stop, we held that there was a Fourth Amendment violation.

Unlike the situation in *Slydell*, the officers here were responding to a reported crime with a victim who had called 911. The BOLO indicated that the suspects fled south after the robbery, which is where the officer found and eventually detained them. Most significantly, the officer had reason to believe the individuals were involved in the robbery because the victim's phone was signaling its location to him through the "Find My Phone" app. The suspects, the only persons in the area identified by the app, were consistent with the victim's description. It was reasonable for the officer to believe that once the defendants saw him, they turned off the phone to conceal their possession of it. There was no error in the trial court's denial of the motion to suppress.

STEVENSON and FORST, JJ., concur.

*        *        *

***Not final until disposition of timely filed motion for rehearing.***