# Supreme Court of Florida

No. SC20-225

**MARK D. SIEVERS,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

November 17, 2022

PER CURIAM.

Mark D. Sievers appeals his first-degree murder conviction and corresponding death sentence, as well as his conviction for conspiracy to commit murder.[1]  We affirm in all respects.

## FACTS AND PROCEDURAL BACKGROUND

### Guilt Phase

On June 28, 2015, Dr. Teresa Sievers left a family vacation and returned alone to her Bonita Springs home.  After pulling into the garage, she retrieved her luggage and walked into the house.

---

1.  We have jurisdiction.  *See* art. V, § 3(b)(1), Fla. Const.

Unbeknownst to Dr. Sievers, Curtis Wayne Wright, Jr., and Jimmy Ray Rodgers were waiting inside to carry out the murder that her husband—defendant Mark D. Sievers—had hired them to perform. When Dr. Sievers entered the kitchen, Wright and Rodgers beat her in the head with hammers until she died.

The murder marked the culmination of a plot that began weeks earlier, when Sievers traveled to Missouri for Wright's May 2015 wedding. Over the course of several conversations during the wedding weekend, Sievers asked his longtime friend Wright to murder Dr. Sievers as soon as possible. Initially uncertain, Wright eventually agreed to "take care of it" for at least $100,000 in life insurance proceeds.

Wright then recruited Rodgers by promising him part of the life insurance money. In his trial testimony, Wright explained that Rodgers had "been involved in other deaths" and characterized him as "somebody that would actually do it." Throughout the planning, only Wright communicated with Rodgers; Sievers had explicitly told Wright that he did not want to know the identity of any accomplice Wright might hire. Sievers and Wright themselves used prepaid cell phones for their calls about the plot, thinking those phones were

- 2 -

safer and more secure than their regular phones. Phone records showed that their prepaid phones became active only after they exchanged a code word on their regular lines.

Sievers envisioned two possible scenarios for the murder: June 28 at the Sieverses' home (to look like a burglary) or June 29 at Dr. Sievers' medical office (to look like a mugging). Sievers knew his wife was set to return home alone from a family vacation on June 28. He had booked her return flight, and he wanted to ensure that he and their daughters would not be in town at the time of the killing.

Sievers prepared in depth for each scenario. For the home murder plan, Sievers tested going over the backyard fence, and he trimmed bushes in the yard to carve out a path to the garage. He also told Wright how to enter the house and disarm the security system. For the office murder plan, Sievers sent Wright aerial photographs of the building, identifying a secluded stairwell that Dr. Sievers used when she left work late at night. He also gave Wright the stairway access code. Sievers told Wright that, regardless of where the murder took place, it should appear to have been committed incident to a burglary or robbery.

Wright and Rodgers left Missouri on June 27, equipped with detailed instructions and money from Sievers. They arrived in Bonita Springs, Lee County, Florida, early the next morning. Wright and Rodgers first stopped at the Sieverses' home and left after a brief visit. Then they drove past Dr. Sievers' medical practice to evaluate its potential as a murder location, but they eliminated that option after feeling too exposed on the property. For the remainder of the day, they napped in their rental car, shopped at Walmart, and spent time at the beach.

Around 10:30 p.m., Wright and Rodgers returned to the Sieverses' residence. They put on coveralls and gloves and "pried open" the already unlocked side door to mimic a burglary. Thinking Dr. Sievers would arrive at midnight, Wright was taken aback when he heard the garage door roll up shortly before 11:25 p.m. Wright scrambled to conceal himself in the garage as he watched Dr. Sievers park the car, retrieve her luggage, and enter the house. Wright then followed her, picking up a hammer that was lying on the garage freezer on his way inside.

As he walked into the kitchen, Wright stumbled on a dog dish, startling Dr. Sievers, who turned toward Wright at the noise.

- 4 -

Wright struck her head once and swung two more times while she put up her hands to defend herself. At this point, Rodgers began to attack her, too. Using a different hammer, Rodgers bludgeoned her in the head over and over. Eventually, Dr. Sievers went silent as she fell to the floor, where Rodgers continued to hit her until Wright made him stop. Certain that Dr. Sievers was dead, Wright and Rodgers left the house and drove back to Missouri.

While Wright and Rodgers were carrying out the murder, Sievers was still at his mother-in-law's home in Connecticut, on vacation with his two daughters. Earlier that day, Sievers out of the blue called Dr. Mark Petrites, a family friend, to "check in" and inform him of Dr. Sievers' travel plans. The next morning, on June 29, Sievers heard from Dr. Sievers' office that she did not show up for work. Sievers again called Dr. Petrites and asked him to stop by the house to check on his wife. Dr. Petrites found it odd that Sievers gave him the garage code and instructed Dr. Petrites to just walk in, rather than first knock on the front door. When he entered the Sieverses' home, Dr. Petrites found Dr. Sievers face down on the kitchen floor in a pool of blood.

The first break in the subsequent police investigation came two weeks later. Law enforcement in Illinois called lead detective David Lebid with the news that someone had come forward with information potentially related to the murder. Lebid traveled to Illinois to conduct an in-person interview of the informant, and, from that interview, Wright emerged as a suspect.

Eventually, police obtained a warrant to search Wright's house in Missouri. There, they seized Wright's cell phone and the GPS used on the trip to Florida, which in turn linked Wright to Rodgers. While detectives executed a search warrant at Rodgers' residence in Missouri, Rodgers' girlfriend, Taylor Shomaker, led authorities to evidence connecting Rodgers to the crime, including the backpack, shoes, shirts, and beverage cooler that had been purchased at a Lee County Walmart on the day of the murder. Shomaker also brought detectives to the sites where she and Rodgers had discarded the coveralls worn during the murder and pieces of Rodgers' deconstructed prepaid cell phone. Wright and Rodgers were then arrested, interrogated, and charged.

Wright initially denied involvement in the murder. But he later confessed, implicated Sievers in the crime, and agreed to a

plea deal. Sievers himself was indicted in May 2016 for first-degree murder and conspiracy to commit murder.

At trial, the State proved its case principally through Wright's testimony; Rodgers did not testify. The State corroborated Wright's account with cell phone, GPS, and video surveillance records that documented both Sievers' painstaking planning and Wright's locations in the weeks before and immediately after the murder. The State presented the backpack, shoes, shirts, and beverage cooler that were purchased in Lee County on the day of the murder and later found in Rodgers' Missouri home. The State also introduced fibers from Rodgers' discarded coveralls worn during the murder that were found on Dr. Sievers' corpse and in the rental car. Dr. Thomas Coyne, the Lee County medical examiner, testified about the autopsy he performed on Dr. Sievers. He determined that she died from blunt head trauma from multiple impact wounds to the back of the skull that were consistent in size with the head of a hammer.

Sievers did not testify at trial. His defense counsel argued in closing that there was no credible evidence connecting Sievers to the crime. According to defense counsel, the State had done

nothing more than prove that Wright and Rodgers—not Sievers—murdered Dr. Sievers. The defense focused on Wright's asserted lack of credibility, highlighting his bipolar disorder, his status as a five-time felon, and his admitted lies during the investigation. The defense theorized that Wright, hoping to protect his wife from being prosecuted for tampering in the murder investigation, was simply parroting a narrative that had been fed to him by the State.

On December 4, 2019, the jury found Sievers guilty of first-degree premeditated murder and conspiracy to commit murder.

**Penalty Phase**

The same jury returned a week later for the penalty phase. The State presented victim impact evidence but otherwise relied on evidence from the trial. Sievers presented mitigating evidence through several relatives, all of whom testified to his loving relationship with his family, especially with his daughters.

The State sought to prove two aggravators: murder committed in a cold, calculated, and premeditated manner with no pretense of moral or legal justification; and murder committed for pecuniary gain. The jury unanimously found the CCP aggravator but not the pecuniary gain aggravator. On the verdict form, it checked that no

mitigating circumstances had been proven, even though Sievers'
lack of criminal history had been conceded by the State. The jury
unanimously recommended a death sentence.

### *Spencer* Hearing and Sentencing

The trial court held a *Spencer*[2] hearing on January 3, 2020.
Sievers entered his clean disciplinary record from the Lee County
Sheriff's Office, a postcard from his daughter, and a letter that had
been written before the murder by Dr. Petrites' wife, expressing her
affection for the Sievers family. The court noted for the record that
Sievers' daughters did not want him to die. Sievers himself made a
statement to the court. He denied involvement in the murder, said
he loved Dr. Sievers and their two daughters, and asked to be
spared from the death penalty. The State introduced an additional
victim impact statement.

After a thirty-minute recess, the trial court sentenced Sievers
to death for the murder conviction and to a consecutive thirty-year
prison sentence for the conspiracy conviction. The court gave great
weight to the jury's recommendation in favor of a death sentence. It

2. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

found the CCP aggravator (but not the pecuniary gain aggravator) proven beyond a reasonable doubt and gave it great weight. The court found the following mitigating circumstances had been established, but gave them little weight: that Sievers had no prior criminal history; that he had a loving and supportive relationship with his family; that his family would be negatively affected if he were to be executed; and that he had engaged in charitable activities that benefited the community. The court found that the mitigating effect of Sievers' positive relationship with his family was undercut by his decision to procure the murder of his daughters' mother. Finally, the court found that the evidence did not support Sievers' requested statutory mitigator for capital felony accomplices whose participation was "relatively minor."

This direct appeal followed.

## ANALYSIS

Sievers raises myriad challenges to his convictions and death sentence, none of them meritorious. We will address Sievers' claims in the order presented in his opening brief.

## Guilt Phase Challenges

*Issues I through III: Polygraph-Related Claims.* A principal theme of Sievers' closing argument was that the State had not subjected Wright to a polygraph examination, even though Wright's plea agreement gave the State the option to do so. Sievers' counsel ended closing argument by telling the jury: "When you weigh the evidence and you look at all these facts, ultimately, the one question you all have to ask yourselves: Do you trust Curtis Wayne Wright? And would you feel different if a polygraph had been administered?" After defense counsel finished, and outside the presence of the jury, the State argued that this reference to a polygraph was improper. Ultimately, the State persuaded the trial court to instruct the jury as follows: "If Mr. Wright had actually taken a polygraph, those results, if they were—if he passed, would not have been admissible during this trial." The State then proceeded to give its rebuttal.

Sievers now argues that the trial court's instruction misstated the law, that it amounted to a comment to the jury on the evidentiary weight of the State's decision not to give Wright a

polygraph exam, and that it indirectly commented on Wright's credibility. We disagree.

As to the first point, Sievers forfeited any challenge to the substance of the trial court's instruction. During the parties' discussion of this issue with the trial court, defense counsel did not contest the instruction's content. Instead, counsel told the trial court that the State, rather than the court itself, should raise the admissibility issue with the jury in the form of an argument.

Nor is there merit to Sievers' claim that the trial court's instruction amounted to a comment on the evidence or on Wright's credibility. The jury could reasonably have taken defense counsel's closing argument to imply that the jury would have known the results of any polygraph exam administered to Wright. Against that backdrop, it was not error for the trial court to issue a clarifying instruction. Importantly, the trial court gave Sievers free rein to argue to the jury that the decision not to subject Wright to a polygraph showed the State's unwillingness to find the truth.

Sievers next maintains that the State, in rebuttal, falsely suggested that Wright would be administered a polygraph exam sometime between the end of trial and Wright's sentencing. The

- 12 -

record does not support this claim. It is true that the State's rebuttal told the jury that Wright remained obligated to take a polygraph at the State's request, but the argument did not imply that the State necessarily would avail itself of that option.

Sievers' final polygraph-related claim has to do with the testimony of lead detective Lebid. Lebid interviewed Wright in July and August 2015, and he was present for Wright's proffer in January 2016 and sworn statement in February 2016. On cross-examination, Lebid acknowledged that the State had not given Wright a polygraph exam, even though Lebid knew that Wright lied in the 2015 interviews and at the beginning of the January 2016 proffer. On redirect and over defense counsel's objection, the prosecution rhetorically asked Lebid if he needed a "lie detector machine" to tell him when Wright was lying—to which Lebid answered "no." Sievers now argues that these questions and answers implied that Lebid had a "natural ability" to detect Wright's truthfulness and thus improperly bolstered Wright's credibility.

The record does not support Sievers' argument. It was defense counsel, during Lebid's cross-examination, who first juxtaposed Wright's undisputed lies with the State's failure to administer a

polygraph exam. In response, the State on redirect elicited testimony that, at the time of Wright's summer 2015 interviews, Lebid was already aware of evidence (*e.g.*, surveillance videos from a Walmart in Florida) that directly exposed Wright's lies. Read in its entirety, the thrust of the testimony on redirect was not that Lebid had an intuitive sense of Wright's credibility, but rather that other evidence available to Lebid showed when Wright was lying. We conclude that no improper bolstering occurred.

*Issue IV: Wright's Reference to Prayer.* On direct examination, Wright acknowledged that he lied at the outset of his January 2016 proffer meeting when he said that he had stayed outside the Sieverses' home while Rodgers alone carried out the killing. Wright explained the lie by testifying that he had "struggled with [his] own personal involvement in it, the physical part of it." But then he said this about his decision to tell the truth: "I just couldn't quite let go of all that. And I took a break. I talked to my attorney. I prayed." Defense counsel objected, arguing that Wright's reference to having prayed violated section 90.611, Florida Statutes (2019). Sievers now argues that this alleged violation appealed to "religious bias" and improperly bolstered Wright's credibility.

We find no violation of section 90.611. That law says: "Evidence of the beliefs or opinions of a witness on matters of religion is inadmissible to show that the witness's credibility is impaired or enhanced thereby." Here, Wright made a fleeting reference to prayer and explicitly equated it with talking to his attorney and taking a break. The prosecution neither solicited Wright's prayer reference nor mentioned it again. Sievers' argument lacks merit.

*Issue V: Wright's February 2016 Meeting with the State.* After the January 2016 proffer, Wright again met with the State on February 19, 2016. The latter meeting proceeded in two parts. First, Wright discussed a plea agreement and agreed to cooperate with the State. Second, Wright made a sworn statement about the murder.

Part of the discussion at the February meeting focused on Wright's wife, Angela. The prosecutor told Wright that the authorities were aware that Mrs. Wright had asked potential witnesses in the investigation to change their statements. In that context, the prosecutor referred to Wright's wife as a "blip on [his] radar screen" that he wanted "to go away." But the prosecutor

- 15 -

explained that the plea agreement would not protect Wright's wife and that she would be prosecuted if the investigation revealed her involvement in the murder. Wright acknowledged that he understood and assented to the plea agreement. He then gave his sworn statement.

At trial, after the State rested its case-in-chief, Sievers recalled Lebid for the purpose of introducing into evidence the video of the "blip" discussion at the February 2016 meeting. The State objected, arguing that the disputed video footage was hearsay, that any introduction of the video needed to occur during Sievers' cross-examination of Wright or Lebid, and that the video evidence would be cumulative in light of Wright's and Lebid's testimony on direct and cross-examination. Sievers countered that it was admissible because the State had opened the door by asking Wright about his truthfulness in its case-in-chief and because the video would show Wright's bias to protect his wife. The trial court excluded the video.

Sievers argues on appeal that the trial court erred by excluding the video footage, but we disagree. Regardless of the merits of the State's hearsay objection or of the State's objection to the timing of Sievers' attempt to introduce the footage, we conclude

- 16 -

that the video evidence was cumulative and therefore properly excluded.  *See* § 90.403, Fla. Stat. (2019) ("Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence."); *Gutierrez v. Vargas*, 239 So. 3d 615, 625 (Fla. 2018) ("Courts should exercise their discretion to avoid the needless waste of time through unnecessary presentation of cumulative evidence.").

The record shows that Sievers questioned both Lebid and Wright about the February 2016 meeting.  During Wright's cross-examination, defense counsel explicitly broached the "blip" discussion that Sievers sought to introduce via the video:

> DEFENSE: You had some concerns that Ms. Wright may be charged in some capacity for this; is that correct?
> WRIGHT: I had concerns that she was going to get—yeah.
> DEFENSE: Yes.
> WRIGHT: Yeah, I don't know about a charge, but yeah.
> DEFENSE: And do you recall that Mr. Hunter said that Angie is a blip that will go away?  Do you recall Mr. Hunter saying that?
> WRIGHT: Yeah.
> . . .
> DEFENSE: That made you feel better about giving your testimony, protecting your wife, correct?
> WRIGHT: Not about giving my testimony, but . . .
> DEFENSE: You love your wife, correct?
> WRIGHT: I do.

DEFENSE: You want to protect your wife, correct?
WRIGHT: I do.
DEFENSE: And so if you can make sure that she is insulated from prosecution, that's something you want, isn't it?
WRIGHT: Yeah, when she's innocent.

On recross, defense counsel again asked if Wright remembered the prosecutor calling Mrs. Wright a "blip" and read portions of the transcript from the February 2016 meeting. Counsel even elicited Wright's acknowledgment that he wanted to protect his wife (though Wright added that his participation in the plea agreement had "nothing to do" with her).

Likewise, during Lebid's cross-examination, defense counsel asked about Mrs. Wright. He said:

DEFENSE: Mr. Hunter asked you about Angela Wright. You said there was no evidence to show that Angela Wright went to Florida; is that correct?
LEBID: Correct.
DEFENSE: Okay. And you said you could—you could affirmatively rule out Angela Wright as a participate—participant in the murder, correct?
LEBID: Correct.
. . .
DEFENSE: If Ms. Wright helped in the planning, she could be charged, correct?
LEBID: Absolutely.
DEFENSE: If she helped Mr. Wright avoid detection, she could be charged for this, correct?
LEBID: Absolutely.

- 18 -

And even after the trial court ruled to exclude the video, counsel questioned Lebid about Mrs. Wright's involvement in the case and how Lebid was able to eliminate her as a suspect.

Finally, relying on the evidentiary foundation developed during trial, defense counsel in closing argument pursued the theme that Wright was lying to protect his wife. Counsel told the jury that Mrs. Wright had tampered with witnesses, and he suggested that the State could have charged her in connection with the murder. Alluding to the prosecutor's remarks at the February 2016 meeting, counsel told the jury: "And why not prosecute Angie [Wright]? Because she's a blip. She's a blip that only Curtis Wright can make go away."

We note that Sievers does not claim that Wright or Lebid gave any trial testimony inconsistent with any statement in the excluded video. On the contrary, their testimony appears to have accurately recounted the exchanges at issue. We find no error in the trial court's decision to exclude this cumulative evidence.

*Issue VI: Sexual Motive.* During Wright's cross-examination, defense counsel inquired whether Lebid had asked Wright about his "sexual preference" and about whether Sievers and Wright "had a

sexual relationship." The trial court sustained the State's relevance-based objections before Wright could answer the questions. In a sidebar, the court explained to counsel: "It's not relevant at this time, unless someone is going to get up and say they had a relationship. I haven't heard it, so I don't see how it's even relevant, and I'm going to sustain the objection." Sievers now argues that the trial court's ruling violated Sievers' confrontation rights and deprived him of an opportunity to explore Wright's motives for murdering Dr. Sievers.

"Limitations on the examination of a particular witness are controlled in the sound discretion of the trial court, and the trial court's ruling in this area will only be reversed if the aggrieved party demonstrates an abuse of that discretion." *Kormondy v. State*, 845 So. 2d 41, 52 (Fla. 2003). We see no abuse of discretion here. It was reasonable for the trial court, before allowing defense counsel to proceed down a tangential and potentially distracting path, to determine whether there was any evidence showing a potential romantic relationship between Wright and Sievers. Absent any proffer from defense counsel to that effect, the trial court acted

- 20 -

within its discretion by sustaining the State's objection to defense counsel's questioning on this issue.

*Issue VII: Neighbor's Testimony.* During the State's case-in-chief, the jury heard testimony from Kimberly Torres, the Sieverses' next-door neighbor. Two aspects of Torres's testimony are at issue on appeal. First, Torres testified about unexpectedly encountering Sievers on her backyard lanai several months before the murder. Second, Torres recounted an argument she overheard between Sievers and Dr. Sievers the month before the murder. Torres testified that Dr. Sievers said, "I'm f-ing tired of this" and "I'm leaving," to which Sievers responded: "If that's what you want to do, fine, but we'll see about that." Sievers objected at trial to these portions of Torres's testimony.

Sievers now argues that the trial court should not have allowed the testimony about the lanai encounter because it was irrelevant, overly prejudicial, and evidence of prior bad acts. But we see no error in the admission of this testimony. Torres's testimony tended to corroborate Wright's account that Sievers had actively scoped out his home as a possible murder location and investigated

jumping over the backyard fence as the best way to access the home.

As to Torres's testimony about the overheard argument, Sievers maintains that the statements Torres attributed to Dr. Sievers and him are hearsay and do not fall within any exception to the hearsay rule. The State counters that the statements qualify under exceptions for excited utterances and for statements of then-existing state of mind. In particular, the State says that Sievers' "we'll see about that" comment shows Sievers' state of mind and helps explain his conduct in having his wife killed.

We need not resolve the question whether the disputed statements qualified for any hearsay exception or, indeed, whether the statements even meet the definition of hearsay; after all, it is not obvious that the statements contained assertions that were offered to prove the truth of the matter asserted. Any error in admitting Torres's testimony about the Sievers' argument was harmless because there is no reasonable possibility that such error contributed to the conviction.

To the extent it relied on Torres's testimony at all, the State focused on the lanai encounter, not the overheard argument. In closing argument, the State emphasized what it called Sievers' "recon mission" to Torres's backyard. But the State did not even mention the overheard argument. Nor did the State in closing argue to the jury that marital problems explained the murder. Instead, the State argued that Dr. Sievers' substantial life insurance gave Sievers a financial motive to commit the crime. Under these circumstances, we believe the State has met its burden to prove harmless error beyond a reasonable doubt.

*Issue VIII: Autopsy Photographs.* Sievers next challenges the trial court's decision to admit eleven autopsy photographs showing trauma to Dr. Sievers' head and body. The photographs depicted injuries to her skull from multiple angles, as well as defensive wounds on her body. Sievers argues that the photos' prejudicial effect substantially outweighed their probative value.

We find no abuse of discretion in the admission of the autopsy photographs here. In this case, the photographs corroborated Wright's testimony about the murder and assisted the jury in understanding the medical examiner's testimony.

*Issue IX: Cumulative Error.* Sievers next argues for reversal based on cumulative error. That doctrine applies where multiple errors, though individually harmless, combine to deprive the defendant of a fair and impartial trial. *McDuffie v. State*, 970 So. 2d 312, 328 (Fla. 2007). The cumulative error doctrine has no place in this case because we have not found multiple errors. *See Fletcher v. State*, 168 So. 3d 186, 220 (Fla. 2015); *Pagan v. State*, 830 So. 2d 792, 815 (Fla. 2002).

*Issues X and XI: Motions for Judgment of Acquittal.* Sievers maintains that the trial court erred in denying his motions for judgment of acquittal on the first-degree murder count and on the conspiracy count. We review the denial of a motion for judgment of acquittal de novo and uphold convictions supported by competent, substantial evidence. *Pagan*, 830 So. 2d at 803. If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction. *Id.* For the reasons we explain, we affirm the trial court's denial of Sievers' motions for judgment of acquittal on both counts.

As to the first-degree murder count, the State had to prove that Dr. Sievers was dead, that Sievers' criminal act caused her death, and that her death was premeditated. § 782.04(1)(a), Fla. Stat. (2019). Because Sievers was not present at the murder, the jury was instructed on the principal theory of liability. Under that theory, Sievers could be found guilty of first-degree murder if he had procured, hired, or aided Dr. Sievers' killing. § 777.011, Fla. Stat. (2019).

Wright's testimony was sufficient to establish every necessary element of the crime, and it is not for our Court to determine the credibility of that testimony. Specifically, the jury could conclude from Wright's testimony that Sievers had promised to pay Wright to murder Dr. Sievers, that Sievers and Wright carefully planned the murder weeks in advance, and that Wright and Rodgers murdered Dr. Sievers according to Sievers' plan. As we have explained, the State corroborated Wright's testimony with cell phone evidence showing their communications leading up to the murder. The State also presented evidence corroborating Wright's account of his and Rodgers' commission of the crime. We therefore reject Sievers' claim, and, under our independent obligation to review the

sufficiency of the evidence, we conclude that competent, substantial evidence supports Sievers' first-degree murder conviction.  *See* Fla. R. App. P. 9.142(a)(5).

As to the conspiracy count, Sievers points to the fact that the indictment alleged that he conspired with both Wright and Rodgers. Sievers claims that he was entitled to a judgment of acquittal given the undisputed evidence that Sievers never communicated with Rodgers about the murder and told Wright that he did not want to know the identity of any accomplice.

Sievers' argument here misstates the law of conspiracy.  To sustain a conspiracy conviction, the government does not need to prove that the defendant knew the identity of every other person alleged to have been part of the conspiracy.  It is enough that the State prove that the alleged co-conspirators shared a common purpose to commit the crime.  *See Blumenthal v. United States*, 332 U.S. 539, 557 (1947) ("[T]he law rightly gives room for allowing the conviction of those [members] discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others."); *Pino v. State*, 573 So. 2d 151, 152 (Fla. 3d

DCA 1991) ("Moreover, direct proof of the criminal agreement is not necessary to establish a conspiracy; the jury may infer from all the surrounding circumstances that a common purpose to commit a crime existed."). Here, Wright's testimony was sufficient to support a jury finding that Sievers, Wright, and Rodgers all were members of a single plot to murder Dr. Sievers.

## Penalty Phase Challenges

*Issue XII: Notice of Intent to Seek the Death Penalty.* Section 782.04(1)(b), Florida Statutes (2016) (effective Mar. 7, 2016), sets out certain procedural requirements for death penalty cases. In pertinent part it says:

> If the prosecutor intends to seek the death penalty, the prosecutor must give notice to the defendant and file the notice with the court within 45 days after arraignment. The notice must contain a list of the aggravating factors the state intends to prove and has reason to believe it can prove beyond a reasonable doubt. The court may allow the prosecutor to amend the notice upon a showing of good cause.

This provision went into effect in March 2016, and the State concedes that it applied to Sievers' prosecution.[3]

---

3. Florida Rule of Criminal Procedure 3.181 also governs the State's notice to seek the death penalty, but that rule is

Sievers was arraigned on May 9, 2016. Forty-four days later—that is, one day before the statutory deadline—the State filed a notice of intent to seek the death penalty. But that notice did not list the aggravating factors that the State intended to prove. The omission was inadvertent, as the State appears to have been unaware of the then relatively new requirements of section 782.04(1)(b). Instead, the State had filed the notice under the 2016 version of Criminal Procedure Rule 3.202, which pertained to discovery in death penalty cases and did not require any aggravators to be listed.

Sievers soon filed a motion to strike the State's notice. That same day—four days after the expiration of the 45-day deadline—the State filed an amended, substantively compliant notice that listed two aggravating factors. Sievers responded with a motion to strike the State's amended notice.

After a hearing, the trial court entered an order denying Sievers' motions to strike. The court concluded that the State's

---

inapplicable here because the Court did not adopt it until months later, on September 15, 2016.

initial filing, though defective for failing to list aggravators, was timely. And the court further ruled that the State had shown good cause for filing an amended, compliant motion—specifically, that the delay was "negligible" and that Sievers was not prejudiced. Sievers now argues that the trial court's ruling was in error and that the State's failure to file a timely, compliant notice requires this Court to reverse Sievers' death sentence.

We affirm, but on grounds independent of the merits of the trial court's good cause determination. Guided by our Court's analysis in *Massey v. State*, 609 So. 2d 598 (Fla. 1992), the most analogous precedent of which we are aware, we conclude that any procedural defect here is subject to harmless error analysis.

In *Massey*, the state had failed to comply with a statute that required notice to be served on the defendant before his sentencing as a habitual felony offender. The defendant argued that the state's procedural misstep required vacatur of his sentence. Our Court disagreed, relying on section 59.041, Florida Statutes (1989). That statute instructs that a reviewing court may not set aside a criminal judgment "for error as to any matter of pleading or procedure" unless the court determines that "the error complained of has

resulted in a miscarriage of justice." Our Court's precedents equate this statutory standard with the harmless error test. *See State v. Lee*, 531 So. 2d 133, 136 n.1 (Fla. 1988). In *Massey*, we emphasized: "[T]he issue in this case is not whether Massey must show harm in order to assert the lack of notice as error but rather whether the state, by affirmatively proving no harm, can bring this technical error within the harmless error rule." 609 So. 2d at 600.

Here, as in *Massey*, we are faced with a statute that imposes a mandatory claim processing (*i.e.*, nonjurisdictional) rule but does not specify a remedy for noncompliance. Applying the harmless error standard of review, we conclude that the State has shown beyond a reasonable doubt that Sievers suffered no prejudice from any delay in the State's full compliance with section 782.04(1)(b). In Sievers' case, the State filed a compliant notice within four days of the statutory deadline. At that time, discovery had not commenced, and no hearings were scheduled. Sievers' trial did not begin until three and a half years later, in November 2019. Given these circumstances, we find harmless error and therefore decline to vacate Sievers' death sentence.

*Issue XIII: Prior Criminal History Mitigator.* On the penalty phase verdict form, the jury checked "no" to the statement: "One or more individual jurors find that one or more mitigating circumstances was established by the greater weight of the evidence." The jury did so even though the State, in its penalty phase closing argument, twice conceded that Sievers had established the statutory mitigator for "no significant history of prior criminal activity."

Sievers now maintains that the jury's decision was a reaction to a misstatement by the State in that same closing argument. During a question-by-question explanation of the penalty phase verdict form, the State told the jury: "So, if one or more individual jurors find that one or more mitigating circumstances was established by the greater weight of the evidence, check 'no.' It was not." Sievers claims that, through this misstatement, the State "persuaded" the jury to reject an "important undisputed" mitigator and thereby "corrupted the jury's decision-making process."

Because Sievers did not object to the disputed statement at trial, we review this claim for fundamental error. And we find no such error here. Almost immediately after the statement at issue,

in the same closing argument, the State again told the jury that Sievers had no prior criminal history.  After the State's closing, defense counsel reminded the jury about the State's concession.  And finally, after the parties' penalty phase closing arguments, the trial court instructed the jury on the law of mitigating circumstances and accurately explained the penalty phase verdict form.  Viewing the relevant record as a whole, we conclude that Sievers has fallen far short of the high bar necessary to establish fundamental error as to this claim.  *Santiago-Gonzalez v. State*, 301 So. 3d 157, 175 (Fla. 2020) (reciting fundamental error standard).

*Issue XIV: Postcard Redaction.*  As mitigation, Sievers repeatedly emphasized his loving relationship with his family, especially his two daughters.  In addition to offering live testimony from several relatives, Sievers sought to prove that relationship by introducing into evidence a postcard his daughter had sent him while he was in custody.  The State objected to the postcard as hearsay but agreed to its admission—including a portion of the postcard saying "I love you"—subject to redaction of these three sentences:  "Is it possible they could kill you?  I really hope NOT.  Please say no."  (Emphasis in original.)  The postcard was redacted

over Sievers' objection and admitted into evidence. Sievers now argues that the redaction constituted reversible error.

Our precedent establishes that, in the penalty phase of a capital trial, both the State and the defendant must be afforded the opportunity to rebut hearsay evidence sought to be admitted by the other side. *Frances v. State*, 970 So. 2d 806, 813-14 (Fla. 2007). There is no question that the redacted portion of the postcard— saying that the daughter did not want Sievers to be executed—was hearsay. Here, neither of Sievers' daughters testified, and the State would have had no opportunity to cross-examine the author of the postcard. We find no abuse of discretion in the trial court's evidentiary ruling.

*Issue XV: Victim Impact Evidence.* At the penalty phase trial, the State presented victim impact evidence consisting of live testimony from Dr. Sievers' mother and a brief video clip of Dr. Sievers herself. In the video, Dr. Sievers discusses her commitment to practicing holistic and preventative medicine. Sievers objected at trial, and he now argues that the admission of the video, particularly in combination with the testimony of Dr. Sievers' mother, was reversible error.

We find no error in the admission of the victim impact evidence here. Under Florida law, victim impact evidence is admissible "to demonstrate the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death." § 921.141(8), Fla. Stat. (2019). Our Court regularly upholds the admission of victim impact evidence that falls within the statutory definition. *See, e.g., Colley v. State*, 310 So. 3d 2, 17 (Fla. 2020) (statement from victim's friend detailing victim's unique characteristics permissible); *Jordan v. State*, 176 So. 3d 920, 932-33 (Fla. 2015) (statement from victim's family detailing loss permissible). In this case, the live testimony and the brief (less than two-minute) video were relevant to show the loss suffered by Dr. Sievers' family and community, and this evidence was not unduly prejudicial.

*Issue XVI: Alleged Failure to Hold a* Spencer *Hearing.* The *Spencer* hearing is an aspect of the capital sentencing process that typically occurs after the penalty phase trial and jury recommendation, but before the trial court's imposition of sentence. We have explained that the purpose of a *Spencer* hearing is to:

(a) give the defendant, his counsel, and the State, an opportunity to be heard; (b) afford, if appropriate, both the State and the defendant an opportunity to present additional evidence; (c) allow both sides to comment on or rebut information in any presentence or medical report; and (d) afford the defendant an opportunity to be heard in person.

*Spencer*, 615 So. 2d at 691. In this case, the trial court on January 3, 2020, held a hearing at which all of these things occurred— including an in-person statement from Sievers, argument from defense counsel, and the admission of additional mitigating evidence. After hearing from the parties, the trial court took a recess to collect its thoughts. The court then returned and imposed its sentence.

Although he did not object to the trial court's procedure at the time, Sievers now argues that our Court's decision in *Spencer* required the trial court to impose sentence on a separate day after the *Spencer* hearing. Sievers maintains that the procedure that the court followed here amounted to a failure to hold a *Spencer* hearing at all, and that this was fundamental error.

Sievers' argument lacks merit. Our decision in *Spencer* does not categorically preclude the trial court from holding a *Spencer* hearing and imposing sentence on the same day. Nor does Florida's

death penalty statute say that a *Spencer* hearing and the imposition of sentence must occur on different days. § 921.141, Fla. Stat. (2019). We find no error—much less fundamental error—in the procedure that the trial court followed here. *See Robertson v. State*, 187 So. 3d 1207, 1216-17 (Fla. 2016) (combining *Spencer* hearing and imposition of sentence in one proceeding did not violate due process where defendant presented evidence and addressed the court before imposition of sentence).

*Issue XVII: Cold, Calculated, and Premeditated Aggravator.* Sievers argues that the jury's CCP finding lacks a constitutional basis because it depended entirely on Wright's (allegedly uncredible) testimony. We reject this claim for the same reason that we rejected Sievers' challenge to the denial of his motion for judgment of acquittal. It is the jury's role, not ours, to evaluate witnesses' credibility and weigh the evidence.

*Issue XVIII: Proportionality Review.* Sievers lastly urges us to undertake a proportionality review. We held in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020), however, that this Court lacks constitutional or statutory authority to do so. We decline to revisit *Lawrence* here.

# CONCLUSION

We affirm Sievers' first-degree murder conviction and corresponding death sentence, as well as his conviction for conspiracy to commit murder.

It is so ordered.

MUÑIZ, C.J., and CANADY, POLSTON, COURIEL, and GROSSHANS, JJ., concur.
LABARGA, J., concurs in result with an opinion.
FRANCIS, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result.

Because I continue to adhere to my dissent in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020), wherein this Court abandoned this Court's decades-long practice of comparative proportionality review in direct appeal cases, I can only concur in the result.

An Appeal from the Circuit Court in and for Lee County,
Bruce E. Kyle, Judge – Case No. 362015CF000673000BCH

Howard L. "Rex" Dimmig, II, Public Defender, and Karen M. Kinney, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida,

for Appellant

Ashley Moody, Attorney General, Tallahassee, Florida, and Christina Z. Pacheco, Assistant Attorney General, Tampa, Florida,

for Appellee